1   MILBANK, TWEED, HADLEY & McCLOY
    LLP
2   LINDA DAKIN-GRIMM (CA Bar No.
    119630)
3   ldakin-grimm@milbank.com
    601 South Figueroa Street, 30th Floor
4   Los Angeles, CA 90017
    Telephone: (213) 892-4000
5   Facsimile: (213) 629-5063

6   *Attorneys for Respondent Broadcast Music,*
    *Inc.*
7

8   CALDWELL LESLIE & PROCTOR, P.C.
    LINDA M. BURROW (CA Bar. No.
9   194668)
    burrow@caldwell-leslie.com
10  1000 Wilshire Boulevard, Suite 600
    Los Angeles, CA 90017-2463
11  Telephone: (213) 629-9040
    Facsimile: (213) 629-9022
12

13  *Attorneys for Non-Party Fox Broadcasting*
    *Company*

14                  UNITED STATES DISTRICT COURT

15              CENTRAL DISTRICT OF CALIFORNIA

16  WPIX, INC., et al.,                  Case No.: CV11 04052 SJO (JEMx)

17                  Applicants,          Related to Case No. 09-CV-10366
                                         (LLS) (S.D.N.Y.)
18          v.
                                         **JOINT STIPULATION REGARDING**
19                                       **RESPONDENT BMI'S MOTION TO**
    BROADCAST MUSIC, INC.,               **COMPEL FOX BROADCASTING**
20                  Respondent.          **COMPANY TO PRODUCE**
                                         **DOCUMENTS**
21
                                         Hearing Date: 6-21-11
22                                       Time: 10:00AM
                                         Discovery Cutoff:      TBD
23                                       Pre-trial Conference:  TBD
                                         Trial Date:            TBD
24                                       SPRing st   833C

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.   RESPONDENT'S INTRODUCTORY STATEMENT ...................................... 1

II.  FOX BROADCASTING COMPANY'S INTRODUCTORY STATEMENT ........................................................................................ 4

III. REQUEST NOS. 5-11 & 13:  REVENUE RELATED DOCUMENTS ............ 7

    A.   RESPONDENT'S POSITION AND SUPPORTING POINTS & AUTHORITIES ............................................................... 10

        1.   FOX's Revenue Documents Are Necessary for BMI to Defend Applicants' Petition and Demonstrate a Reasonable Rate for Use of BMI Music ...................... 11

            a.   FOX's Advertising Revenue Documents .......................... 13

            b.   FOX's Retransmission Consent Revenue Documents ....... 16

            c.   FOX's Overall Revenue Documents .................................. 19

        2.   FOX's Revenue Documents Are Discoverable ........................... 20

    B.   FBC'S POSITION AND SUPPORTING POINTS & AUTHORITIES ...................................................................... 24

        1.   Fox Broadcasting Company Is Not a Party to BMI's Rate Proceeding .................................................................. 24

        2.   The Requested Revenue Information Is Extremely Confidential .................................................................. 26

        3.   The Confidential and Sensitive Nature of the Financial Information Requested from FBC Outweighs Any Purported Need That BMI Contends It Has for This Information .............. 28

        4.   To the Extent that BMI is Entitled to Any Discovery Concerning Applicants' Retransmission Consent Revenues, It Should Be Obtained from the Applicants ................................. 34

IV.  REQUEST NO. 12:  DOCUMENTS RELATED TO AUDIENCES FOR CERTAIN PROGRAMMING ........................................................................ 35

i

A.    RESPONDENT'S POSITION AND SUPPORTING POINTS & AUTHORITIES ..................................................................36

    1.    Documents Concerning Audiences are Highly Relevant ............37

    2.    The Protective Orders Entered in this Litigation Adequately Address FOX's Confidentiality Concerns ....................................40

    3.    FOX Has Not Established Undue Burden, and Even If It Could, BMI's Substantial Need for the Documents Outweigh Any Burden ..................................................................................41

B.    FBC'S POSITION AND SUPPORTING POINTS & AUTHORITIES ..................................................................44

    1.    BMI Can Obtain All Relevant Audience Information Through Less Burdensome and More Convenient Means ..........44

    2.    BMI's Request for All Documents Concerning the Audience of the Identified Programs Is Unduly Burdensome ....................46

V.    REQUEST NO. 14:  DOCUMENTS RELATED TO CHANGES IN MUSIC USE IN FOX PROGRAMMING ....................................................48

A.    RESPONDENT'S POSITION AND SUPPORTING POINTS & AUTHORITIES ..................................................................49

B.    FBC'S POSITION AND SUPPORTING POINTS & AUTHORITIES ..................................................................51

    1.    BMI Already Has All of the Music Use Information It Seeks .....51

    2.    FBC, as a Non-Party, Should Not Bear the Burden of Producing Information BMI Already Has ....................................53

    3.    The Court Should Reject BMI's Attempt to Impose Discovery Burdens on a Non-Party to Which It Has Objected as a Party ..................................................................................53

VI.    REQUEST NO. 17-19:  DOCUMENTS RELATED TO NEW MEDIA .........55

A.    RESPONDENT'S POSITION AND SUPPORTING POINTS & AUTHORITIES ..................................................................57

ii

B.      FOX BROADCASTING COMPANY'S POSITION AND
SUPPORTING POINTS & AUTHORITIES ......................................... 61

     1.      The Documents Requested Do Not Relate to Applicants'
Performances of FBC Programming ................................. 61

     2.      BMI Refused to Produce Its Own Documents Related to
"New Media" Performances by Non-Parties on Grounds of
Relevance and Burden .................................................... 62

VII.      FOX BROADCASTING COMPANY'S OBJECTIONS RELATING TO
UNDUE BURDEN ................................................................... 64

     A.      RESPONDENT'S POSITION AND SUPPORTING POINTS &
AUTHORITIES ....................................................................... 64

     1.      FOX has Done Nothing to Satisfy Its Heavy Burden of
Showing That Any Request Is Vague, Ambiguous,
Overbroad, or Unduly Burdensome ................................. 64

     2.      BMI's Requests Are Narrowly Tailored to Seek Information
That is Critical to the Rate Court Proceeding ................... 65

     B.      FOX BROADCASTING COMPANY'S POSITION AND
SUPPORTING POINTS & AUTHORITIES ......................................... 66

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Arista Records LLC v. Lime Group LLC*,
    No. 06 CV 5936, 2011 WL 781198 (S.D.N.Y. Mar. 4, 2011) ..............30, 44, 47

*Beckman Indus., Inc. v. International Ins. Co.*,
    966 F.2d 470 (9th Cir. 1992) ..............................................................................21

*Beinin v. Center for the Study of Popular Culture*,
    No. 06-2298, 2007 WL 832962 (N.D. Cal. Mar. 16, 2007)...............................29

*Broadcast Music, Inc. v. Weigel Broad. Co.*,
    488 F. Supp. 2d 411 (S.D.N.Y. 2007) ........................................................passim

*BSN Med., Inc. v. Parker Med. Assoc., LLC*,
    No. 10 Misc. 15., 2011 WL 197217 (S.D.N.Y. Jan. 19, 2011) .........................30

*Buffalo Broad. Co. v. American Soc'y of Composers, Authors and Publishers*,
    744 F.2d 917 (2d Cir. 1984) ............................................................................15

*Centurion Indus., Inc. v. Warren Steurer & Assocs.*,
    665 F.2d 323 (10th Cir. 1981) ........................................................................21

*City of Rialto v. United States Dep't of Defense*,
    492 F. Supp. 2d 1193 (C.D. Cal. 2007) ......................................................12, 29

*Coca-Cola Bottling Co. of Shreveport, Inc. v. Coca-Cola Co.*,
    107 F.R.D. 288 (D. Del. 1985) ...............................................................21, 22, 29

*Compaq Computer Corp. v. Packard Bell Electronics, Inc.*,
    163 F.R.D. 329 (N.D. Cal. 1995) .....................................................21, 22, 23, 34

*Coulter v. Murrell*,
    No. 10-102, 2011 WL 666894 (S.D. Cal. Feb. 14, 2011) ...........................25, 28

*Cusamano v. Microsoft Corp.*,
    162 F.3d 708 (1st Cir. 1998)...............................................................................28

*Dart Indus. Co. v. Westwood Chemical Co.*,
    649 F.2d 646 (9th Cir. 1980) ..............................................................................29

*DirecTV, Inc. v. Trone*,
  209 F.R.D. 455 (C.D. Cal. 2002)........................................................................28

*Gonzales v. Google, Inc.*,
  234 F.R.D. 674 (N.D. Cal. 2006) ...............................................................passim

*Hickman v. Taylor*,
  329 U.S. 495, 67 S. Ct. 385, 91 L. Ed. 451 (1947) ....................................12, 29

*Hill v. Eddie Bauer*,
  242 F.R.D. 556 (C.D. Cal. 2007)...................................................................12, 29

*In re Yassai*,
  225 B.R. 478 (Bankr. C.D. Cal. 1998) ........................................................passim

*Jimenez v. City of Chicago*,
  733 F. Supp. 2d 1268 (W.D. Wa. 2010)...........................................................35

*JZ Buckingham Investments LLC v. United States*,
  78 Fed. Cl. 15 (Fed. Cl. 2007) ..........................................................................43

*Kapila v. MTV Networks Co.*,
  No. 6:10-cv-181-Orl-28 (M.D. Fla. May 6, 2010) ...........................................23

*LG Display Co., Ltd. v. Chi Mei Optroelectronics Corp.*,
  No. 08cv2408-L (POR), 2009 WL 223585 (S.D. Cal. Jan. 28, 2009) ..............43

*Moda v. Priceline.com, Inc.*,
  No. 06-0474, 2008 WL 4447682 (C.D. Cal. Sep. 29, 2008)............................53

*Nidec Corp. v. Victor Co. of Japan*,
  249 F.R.D. 575 (N.D. Cal. 2007) ....................................................35, 44, 48, 54

*Oakes v. Halvorsen Marine Ltd.*,
  179 F.R.D. 281 (C.D. Cal. 1998)...................................................................22, 29

*Paulsen v. Case Corp.*,
  168 F.R.D. 285 (C.D. Cal. 1996)......................................................................29

*Ramirez v. County of Los Angeles*,
  231 F.R.D. 407 (C.D. Cal. 2005).......................................................................65

*Sedaghatpour v. California*,
  No. C. 07-1802, 2007 WL 4259214 (N.D. Cal. Dec. 3, 2007) .........................12

v

*Thomas v. Hickman*,
    No. 1:06-cv-00215-AWI-SMS, 2007 WL 4302974 (E.D. Cal. Dec. 6, 2007)......
    ..............................................................................................................42, 43

*United States v. Am. Soc'y of Composers, Authors, and Publishers* (*In re Application of Am. Online, Inc.*),
    559 F. Supp. 2d 332 (S.D.N.Y. 2008) ....................................................9, 15, 30

*United States v. Am. Soc'y of Composers, Authors and Publishers* (*In re Application of Buffalo Broad. Co.*),
    No.13-95, 1993 WL 60687 (S.D.N.Y. Mar. 1, 1993)  ..........................32, 44, 48

*United States v. Am. Soc'y of Composers, Authors, and Publishers* (*In re Application of Capital Cities/ABC, Inc.*),
    831 F. Supp. 137 (S.D.N.Y. 1993) .................................................................passim

*United States v. Am. Soc'y of Composers, Authors, and Publishers* (*In re Application of Capital Cities/ABC, Inc.*),
    157 F.R.D. 173 (S.D.N.Y. 1994) ....................................................................passim

*United States v. Am. Soc'y of Composers, Authors and Publishers* (*In re Applications of Fox Broadcasting Co.*),
    870 F. Supp. 1211 (S.D.N.Y. 1995) ...............................................................passim

*United States v. Am. Soc'y of Composers, Authors and Publishers* (*In re Applications of RealNetworks, Inc., Yahoo! Inc.*),
    627 F.3d 64 (2d Cir. 2010) .............................................................15, 30, 50, 51

*United States v. Am. Soc'y of Composers, Authors, and Publishers* (*In re Applications of Salem Media of Cal., Inc.*),
    981 F. Supp. 199 (S.D.N.Y. 1997) ..............................................................30, 50

*United States Equal Emp't Opportunity Comm'n v. Pinal County*,
    714 F. Supp. 2d 1073 (S.D. Cal. 2010) ..............................................................53

*United States ex rel. Schwartz v. TRW, Inc.*,
    211 F.R.D. 388 (C.D. Cal. 2002).......................................................................12

*Viacom Int'l, Inc. v. YouTube Inc.*,
    253 F.R.D. 256 (S.D.N.Y. 2008).......................................................................28

*Viacom Int'l, Inc. v. YouTube, Inc.*,
    No. C 08-80129 SI, 2008 WL 3876142 (N.D. Cal. Aug. 18, 2008) ............39, 40

*Viacom Intern., Inc. v. YouTube, Inc.*,
    No. C-08-80211 MISC. JF (PVT), 2009 WL 102808 (N.D. Cal. Jan. 14,
    2009) ........................................................................................................43

*Visto Corp. v. Smartner Info. Sys.*,
    Nos. 06-80339, 06-80352, 2007 WL 218771 (N.D. Cal. Jan. 29, 2007) ..............
    .................................................................................................28, 34, 35

**STATUTES**

47 U.S.C. § 325(b)(1) ...............................................................................16

Cable Television Consumer Protection and Competition Act of 1992,
    Pub. L. No. 102-385, 106 Stat. 1460 (codified as amended in scattered
    sections of 47 U.S.C.) ........................................................................16

**RULES**

C.D. Cal. R. 37-1 ....................................................................................47

C.D. Cal. R. 37-2 ......................................................................................4

C.D. Cal. R. 37-2.1 ...................................................................................1

Fed. R. Civ. P. 26....................................................................................1, 12

Fed. R. Civ. P. 26(b) ............................................................................12, 13

Fed. R. Civ. P. 26(b)(1) .........................................................................12, 38

Fed. R. Civ. P. 26(b)(2)(C) ....................................................................48, 53

Fed. R. Civ. P. 26(C)(iii) ...........................................................................29

Fed. R. Civ. P. 34.....................................................................................26

Fed. R. Civ. P. 45.......................................................................1, 12, 26, 46

Fed. R. Civ. P. 45(c)(1).........................................................................29, 53

**OTHER SOURCES**

Fed. R. Civ. P. 45 advisory committee's note .........................................8

Pursuant to Federal Rules of Civil Procedure 26 and 45 and Rules 37-2.1 of the Local Civil Rules of the U.S. District Court for the Central District of California, Respondent Broadcast Music, Inc. ("BMI") and non-party, Fox Broadcasting Company ("FOX" or "FBC"), submit this Joint Stipulation Regarding Respondent BMI's Motion to Compel the Production of Documents from FOX.

## I.

## RESPONDENT'S INTRODUCTORY STATEMENT

The dispute here relates to a subpoena served on FOX (the "Subpoena") for documents to be used in a proceeding pending in the U.S. District Court for the Southern District of New York (the "SDNY").  Although FOX claims to be a "disinterested third-party" with no interest in the outcome of the underlying proceeding, it is not.  In fact, FOX has a significant interest in the proceeding.  The case before the SDNY is a "rate court proceeding" in which the entire local broadcast television industry has petitioned the SDNY to set a reasonable fee for a music performing right license from BMI (the "Rate Court Proceeding"), one of three national performing right organizations ("PROs"), to cover their use of music on television during the period between January 1, 2005 through December 31, 2014.[1] BMI operates on a not-for-profit basis. It issues non-exclusive licenses to users of copyrighted music, collects license fees from them, and distributes royalties to the more than 400,000 songwriters, composers, and music publishers who have granted BMI the non-exclusive right to license the public performance of their copyrighted musical works.  Dakin-Grimm Decl. Ex. B ¶ 5.

The SDNY's jurisdiction arises from a consent decree that settled an antitrust suit against BMI. Dakin-Grimm Decl. Ex. C.  The consent decree requires BMI to grant a license to any music user that applies for one and to quote a reasonable

---

[1]     Declaration of Linda Dakin-Grimm in Support of BMI's Motion to Compel Fox Broadcasting Company to Produce Documents ("Dakin-Grimm Decl.") Ex. A ¶¶ 1-2.

fee for a requested license. *Id.* § XIV(A). It also establishes the SDNY as the "rate court" that decides reasonable fees when the parties fail to reach an agreement. *Id.*

Applicants in the Rate Court Proceeding are owners of approximately 1,200 domestic local commercial broadcast television stations, including Fox (collectively, "Applicants").[2] They have asked the SDNY to resolve a dispute over the fee for a license that would cover the use of all music in BMI's repertoire on all of Applicants' stations. Dakin-Grimm Decl. Ex. A ¶¶ 1, 5. The license sought excludes, *inter alia,* music used in the programs supplied by the ABC, CBS, NBC and Univision networks (the "Licensed Networks") to their affiliated stations. *Id.*[3] *But the license sought in the SDNY includes music used in all programs FOX provides to its affiliates.*

Unlike the Licensed Networks, FOX does not pay BMI for a separate "through-to-viewer" license for the use of BMI music in the programming it supplies to its 175 local "affiliate" stations, and to the 27 local stations Fox itself owns and operates (together, "the FOX Affiliate Stations"). Instead, the 202 FOX Affiliate Stations must themselves obtain and pay for licenses for music used in all programming—including FOX network programming—broadcast on their stations.[4] The license that Applicants seek therefore includes music in all programming that FOX supplies to the FOX Affiliate Stations. Dakin-Grimm Decl. Ex. A ¶ 1. And, as the supplier of some of the most music-intensive and successful programs on television,

---

[2]    The Petition lists "Fox" as an Applicant owner of certain television stations without identifying a specific Fox entity as the owner. *See* Dakin-Grimm Decl. Ex. A at Exhibit A. Because the Petition does not clearly identify Applicants, BMI has requested that FOX's (and Applicants') counsel amend the Petition clearly to identify each station owner that is an Applicant.

[3]    The Licensed Networks separately license and pay for the music performing right for the music in their programs by purchasing "through-to-the viewer" licenses from the PROs.

[4]    *See United States v. Am. Soc'y of Composers, Authors & Publishers (In re Applications of Fox Broad. Co.*), 870 F. Supp. 1211, 1219 (S.D.N.Y. 1995) (local stations pay for the "public broadcast of the music included in Fox's programming").

FOX possesses information that is highly relevant to a determination of the value of music used on Applicants' broadcasts—the central issue in the Rate Court Proceeding. *Id*. Ex. B ¶ 13.

The Subpoena served on FOX seeks documents critical to the SDNY's determination of a reasonable license fee for the Applicants, including the more than two hundred FOX Affiliate Stations.  After conferring in good faith with FOX, BMI withdrew more than half of its requests.[5]  FOX, however, maintains broad sweeping objections and refuses to produce critical information, notwithstanding BMI's offer to take the information subject to strict protective orders.  BMI therefore asks this Court to order FOX to produce documents in three discrete categories: (i) revenue FOX derives from its programming (focusing primarily on five programs that heavily feature music), (ii) audience information, and (iii) FOX's tracking of music use.

The SDNY will need the information BMI seeks to set a rate covering the FOX Affiliate Stations.  When calculating a reasonable fee, rate courts consider, *inter alia*, applicant revenue (including revenue related to programs on which music is used), audience size, and music use.  *United States v. Am. Soc'y of Composers, Authors, and Publishers (In re Application of Capital Cities/ABC, Inc.*), 831 F. Supp. 137, 156-59 (S.D.N.Y. 1993) ("*ABC/CBS*") (setting fee by selecting the fee paid in a "base year" and adjusting it for changes in the network's revenues and music use).

The relevance of the requested documents is plain from the asserted claims and defenses.  Applicants, including FOX Affiliate Stations, seek a fee reduction based on what they have characterized as dramatically worsening economic conditions and smaller audiences.  Dakin-Grimm Decl. Ex. A ¶¶ 14-15.  BMI seeks a fee increase based on, *inter alia*, (i) an increase in the share of all music that is in BMI's repertoire (compared to other PROs), (ii) *improvements* in Applicants'

---

[5]     BMI withdrew these requests based on representations in letters from FOX's counsel.  Dakin-Grimm Decl. Exs. F, G.

economic circumstances due to their receipt of new revenue streams; and (iii) Applicants' use of more BMI music in their broadcasts.  *Id*. Ex. B ¶¶ 11-15.  FOX plainly has information on all these issues.[6]

## II.

## FOX BROADCASTING COMPANY'S INTRODUCTORY STATEMENT

This Joint Stipulation reflects BMI's second failed attempt to develop meritorious arguments in support of its position.  BMI first presented its portions of a version of this joint stipulation on April 13, 2011.[7]  When non-party Fox Broadcasting Company ("FBC") responded with its own portions, BMI did not prepare the stipulation for filing as contemplated by Local Rule 37-2.  Instead – recognizing numerous deficiencies in its initial version – BMI substantially revised its arguments, dropping some entirely, modifying others, and adding new requests that its prior draft represented had been withdrawn.  BMI's second bite at the apple, however, is no more successful than its first.  BMI's motion remains an overreaching attempt to compel FBC to produce documents that BMI does not need, can obtain more easily from other sources, or already has.  The motion should be denied.

BMI still premises its motion on the utterly false notion that FBC is a party to the above-captioned Rate Court Proceeding between BMI and the owners of local broadcast television stations.  FBC is not a party, and there is no basis for BMI's repeated attempts to portray it as one.  FBC does not own any local stations.  It is a program supplier to a network of stations owned by various other entities that, pursuant to affiliation agreements, broadcast FBC-supplied programming as part of their broadcast day ("Network Affiliates").  FBC does not publicly perform BMI-affiliated music when it supplies programming to Network Affiliates, and the Network

---

[6]     FOX's confidentiality objections are readily addressed by the protective orders already entered in the Rate Court Proceeding.  Dakin-Grimm Decl. Exs. H, I.

[7]  The joint stipulation as initially served by BMI is attached as Exhibit U to the Declaration of Benjamin E. Marks ("Marks Decl.") submitted herewith.

4

Affiliates – not FBC – are responsible for clearing the performance rights for the music embedded in the programs FBC supplies.  FBC has never taken a license from BMI (or any other performing rights organization ("PRO")) for its Network Affiliates' performances of music.  It neither needs nor wants a license for those performances now.  BMI's persistence in depicting FBC as an Applicant in the Rate Court Proceeding, as being a local television broadcaster, as having a financial stake in the outcome of the proceeding, and the like can only be characterized as an attempt to lead the Court astray.

BMI tries to obfuscate FBC's lack of connection to the Rate Court Proceeding because it cannot meet the heightened standard for discovery from non-parties.  Once the lack of connection between FBC and the Rate Court Proceeding is exposed, it is readily apparent that this Court should deny BMI's motion as to each of the three original categories of documents sought as well as the fourth category BMI added on round two.  BMI cannot demonstrate that its need for FBC to produce any of the information it seeks outweighs the undue burden its requests would impose.

•       *Documents Concerning Confidential, Proprietary and Commercially Sensitive FBC Financial Information*.  BMI contends that it needs FBC's most confidential and most sensitive financial information to evaluate and contest the Applicants' assertion that *their* advertising revenues have declined in recent years.  While changes in economic conditions for local television station owners may well be an issue in the Rate Court's consideration of the Applicants' fee petition, FBC is not part of the local broadcast industry, and there is no suggestion in Applicants' petition or otherwise that their fees should depend on FBC's independent financial performance.  PROs have never needed access to FBC revenues to set fees for local television broadcasters before, and BMI does not need it now.

•       *"All Documents" since January 1, 2002 Concerning Audience Size, Share, Ratings, and Demographics for Certain FBC Programs*.  BMI likewise fails to establish why FBC should be put to the extraordinary burden of collecting "all

5

documents" concerning audience metrics for a nine-year period from its various document custodians.  There is a single source for national television audience data—Nielsen.  BMI is already a Nielsen customer and could purchase whatever data it wants, including the exact same data set FBC buys.  There is no reason to saddle FBC with the burden of producing its documents about Nielsen ratings when BMI could simply buy the data it needs from Nielsen.  BMI has not even tried to get what it needs through ordinary commercial channels.

• *"All Documents" over a Thirteen-Year Period Concerning Changes in the Amount of Music in FBC Programming Generally and the Amount of "Feature" Music in Particular.*  BMI professes to be the premiere source for information about music use in television programming, and does not need to get such information from FBC.  In the ordinary course of business, BMI maintains a searchable, electronic database of millions of records obtained from program producers, its own affiliates, local stations, other PROs, and others to reflect the music content of the programs broadcast (including which performances are "feature").  FBC possesses nothing of the sort.

• *Documents Concerning "New Media" Exploitation of FBC Programming.*  As BMI acknowledges, FBC does not authorize Network Affiliates or other Applicants to distribute FBC programming via Internet websites or as part of other "New Media" programming packages that differ from their broadcast activities.  To the extent that some FBC programming is available via "New Media," it is transmitted by entities that have applied for their own licenses from BMI, and performances by those entities are not at issue in this litigation.  BMI's litigating position vis-à-vis the Applicants has been that its own files as to "New Media" performances by entities other than Applicants are off-limits.  This Court should reject BMI's hypocrisy in trying to burden a non-party with discovery that BMI has been unwilling to bear as the Respondent.

# III.

## REQUEST NOS. 5-11 & 13:  REVENUE RELATED DOCUMENTS

**Request No. 5:**

From June 1, 2002 to the present, documents sufficient to show aggregate advertising revenues derived from each of the following programs:  (i) *Glee,* (ii) *So You Think You Can Dance,* (iii) *American Idol,* and (iv) *Bones*.

**Request No. 6:**

From June 1, 2002 to the present, documents sufficient to show revenues derived from each of the following programs:  (i) *Glee,* (ii) *So You Think You Can Dance,* (iii) *American Idol,* and (iv) *Bones* as a percentage of total revenue.

**Response to Request Nos. 5 & 6:**[8]

Fox objects to this request on the grounds that it is overbroad, unduly burdensome, vague, ambiguous, excessive in terms of temporal scope and seeks the disclosure of documents that are irrelevant and/or not reasonably calculated to lead to the discovery of admissible evidence.  This request is also objectionable because it seeks the production of documents that contain confidential proprietary materials and/or trade secrets.

**Request No. 7:**

Documents sufficient to show revenues derived from retransmission consent fees paid to FOX or a FOX Affiliate Station by a cable or satellite television provider.

**Response to Request No. 7:**

Fox objects to this request on the grounds that it is overbroad, unduly burdensome, vague, ambiguous, and seeks the disclosure of documents that are irrelevant and/or not reasonably calculated to lead to the discovery of admissible evidence.  This request is also objectionable because it seeks the production of documents that contain confidential proprietary materials and/or trade secrets, and at

---

[8]     Where FOX interposed identical responses to multiple requests, we have combined those responses herein.

least a portion of this request is more appropriately addressed to defendants in this litigation.

**Request No. 8:**

All annual reports and annual financial statements for each year commencing January 1, 2002 through the present.

**Response to Request No. 8:**

Fox objects to this request on the grounds that it is overbroad, unduly burdensome, vague, ambiguous, excessive in terms of temporal scope and seeks the disclosure of documents that are irrelevant and/or not reasonably calculated to lead to the discovery of admissible evidence. This request is also objectionable because it seeks the production of documents that contain confidential proprietary and competitively sensitive information and/or trade secrets.

**Request No. 9:**

All documents in Your possession, custody, or control concerning projected revenues for the year 2010 and each year thereafter.

**Request No. 10:**

All studies, surveys, analyses, reports, data or other documents in your possession, custody or control concerning projections as to revenues to be derived from *The X Factor*.

**Request No. 11:**

All studies, surveys, analyses, reports, data or other documents in your possession, custody or control concerning projections as to advertising revenue to be derived from *The X Factor*.

**Supplemental Response to Request Nos. 5-11:**

Following a meet-and-confer with BMI, FBC supplemented its initial Objections and Responses by letter, dated March 11, 2011, from Benjamin E. Marks to Linda Dakin-Grimm and Rachel Penski Fissell (Dakin-Grimm Decl. Ex. F at 3-4), further responding in relevant part as follows: "Linda's February 17 letter suggests three possible bases for your assertion that the requested documents concerning nonpublic,

highly confidential, and commercially sensitive information about FBC revenues are relevant.  First, you cite Paragraph 15 of Applicants' petition for the proposition that the requested documents are relevant to the issues in this case.  Paragraph 15 of the Petition addresses the ability of Applicants to generate advertising revenues and has nothing to do with revenues of third parties, such as FBC.  Second, you cite <u>United States v. ASCAP (In re Application of Capital Cities/ABC, Inc., and CBS, Inc.)</u>, 831 F. Supp. 137, 158 (S.D.N.Y. 1993) and <u>United States v. ASCAP (In re Application of Am. Online, Inc.)</u>, 559 F. Supp. 2d 332, 479-80 (S.D.N.Y. 2008) (footnote omitted) for the proposition that "[w]hen determining the reasonableness of license fees like the ones at issue here, courts look to changes in circumstances, including changes in the applicants' revenues."  As we have discussed, FBC is <u>not</u> an applicant in this proceeding -- neither of the cases you cite even addresses the revenues of third parties, let alone stands for the proposition that such revenues are relevant.  Third, you assert that FBC revenues are highly relevant because FBC does not take a through-to-the-viewer license for its network programming.  The connection you are drawing between FBC's decision not to take a through-to-the-viewer license for performances of network programming made by affiliated stations and the need for documents concerning FBC's revenues remains unclear to us.  If the suggestion is that BMI considered the revenues of ABC, NBC, and CBS in negotiating through-to-the-viewer licenses, we note that BMI has refused to produce to the Applicants documents from BMI's files that would reflect revenue information provided by ABC, NBC, and CBS (if any) and what role (if any) such information played in the negotiations of license terms or in BMI's own deliberations as to their reasonableness.  BMI objected to producing such information on numerous grounds including among others, burden and relevance."

**Request No. 13:**

From June 1, 2002 to the present, all rate cards for advertising on *Glee, So You Think You Can Dance, American Idol,* and *Bones*.[9]

**Response to Request Nos. 9-11 & 13:**

Fox objects to this request on the grounds that it is overbroad, unduly burdensome, vague, ambiguous and seeks the disclosure of documents that are irrelevant and/or not reasonably calculated to lead to the discovery of admissible evidence.  This request is also objectionable because it seeks the production of

---

[9]    A rate card, also called an advertising rate card, is a document provided by a media outlet that features the organization's rates for advertising.

documents that contain confidential proprietary materials, competitively sensitive information and/or trade secrets.

**Supplemental Response to Request No. 13:**

Following a meet-and-confer with BMI, FBC supplemented its initial Objections and Responses by letter, dated March 11, 2011, from Benjamin E. Marks to Linda Dakin-Grimm and Rachel Penski Fissell (Dakin-Grimm Decl. Ex. F at 4), further responding in relevant part as follows:  "As additional explanation of the bases for its previously stated objections to this Request, FBC states that advertising rate cards do not reflect its actual advertising rates, and FBC does not typically sell advertising by program."

### A.    Respondent's Position and Supporting Points & Authorities

BMI seeks narrowly tailored information relating to revenues derived from FOX programming that is music intensive—the use of BMI's music on these shows is precisely what is at issue in the Rate Court Proceeding.  This information is relevant, and indeed critical, to assessing Applicants' claim that revenues are declining, and that their viewership is down.  Request Nos. 5, 11, and 13 of the Subpoena seek documents concerning advertising revenue derived from four current FOX programs that rely heavily on music, and projected advertising revenues for one forthcoming FOX music program (the "Advertising Revenue Documents").  Each of these shows heavily features (or will feature) music and has experienced (or is anticipated to experience) unprecedented viewership.[10]  BMI anticipates that the information sought

---

[10]    The programs are (i) *American Idol*, a live performance singing competition show that has been the top-rated television show since its premiere in June 2002; (ii) *The X Factor,* a forthcoming singing competition show, which also will feature live performances of popular music; (ii) *So You Think You Can Dance*, a dance competition show which features contestants performing choreographed dance routines to popular music; (iv) *Glee*, a scripted musical comedy that centers around a high school Glee club and features the club's singing performances as well as interspersed musical interludes, in the style of musical theatre; and (v) *Bones,* a scripted crime drama that so heavily features music, in 2008 the show released a soundtrack with songs featured on the show.  Dakin-Grimm Decl. Ex. J at 1 ("For perspective, at this point 'Idol' could

in discovery will directly contradict Applicants' contentions in the Rate Court Proceeding.  Request No. 7 seeks documents that identify new revenues FOX and its affiliates have recently obtained.   This new revenue stream, called "retransmission consent fees," consists of hundreds of millions of dollars that the FOX Affiliate Stations receive (and FOX negotiates) from cable and satellite operators, in exchange for permitting those operators to retransmit FOX's and the FOX Affiliate Stations' programming ("Retransmission Consent Revenue Documents").  *See* Dakin-Grimm Decl. Ex. O at 4-9.  This information is plainly relevant to assessing Applicants' claim of an "economic downturn" meriting a downward adjustment in fees, and of BMI's defense that Applicants in fact have benefitted tremendously from retransmitting shows containing BMI music in exchange for a significant new stream of revenue. The remaining revenue-related requests (Request Nos. 6, 8-10) seek documents related to additional revenue streams as well as overall historical and projected revenues of FOX.  Without this information, BMI would have no context for measuring the significance of advertising and retransmission consent revenues paid to FOX (the "Overall Revenue Documents", collectively with the Advertising Revenue Documents and the Retransmission Consent Revenue Documents, the "Revenue Documents").

As set forth below, the requested documents are highly relevant and essential to BMI's defenses.  Any confidential or sensitive documents produced by FOX can be adequately safeguarded by the protective orders entered in the case which, in appropriate cases, limit access to documents to attorneys and experts only and provide for the filing of documents under seal.

**1.    FOX's Revenue Documents Are Necessary for BMI to Defend Applicants' Petition and Demonstrate a Reasonable Rate for Use of BMI Music**

---

lose half its audience and still rank among the top 10 shows on television"); *see also* Dakin-Grimm Decl. Exs. K–N.

Although it is beyond dispute that FOX has a significant financial interest in the outcome of the SDNY case, even if FOX were a true third party, the liberal relevance standard applicable to discovery sought from parties, under Federal Rule of Civil Procedure 26(b)(1), applies equally to non-parties. *Gonzales v. Google, Inc.*, 234 F.R.D. 674 (N.D. Cal. 2006); *see also Sedaghatpour v. California*, No. C. 07-1802, 2007 WL 4259214, at *1 (N.D. Cal. Dec. 3, 2007) ("The subpoena . . . is subject to the relevance provisions of FRCP 26(b)(1)."); Fed. R. Civ. P. 45 advisory committee's note (1991) (noting that a "non-party witness is subject to the same scope of discovery" as a party to the action). Under Federal Rule of Civil Procedure 26(b)(1), a party is entitled to discover any non-privileged matter that is "relevant to any party's claim or defense" if it "appears reasonably calculated to lead to the discovery of admissible evidence." Fed. R. Civ. P. 26(b)(1). No privilege defenses are at issue in this motion.

Courts have long applied an expansive view of relevance under Rule 26. *Hickman v. Taylor*, 329 U.S. 495, 507, 67 S. Ct. 385, 392, 91 L. Ed. 451, 460 (1947) ("[T]he deposition-discovery rules are to be accorded a broad and liberal treatment."); *Hill v. Eddie Bauer*, 242 F.R.D. 556, 560 (C.D. Cal. 2007) ("Rule 26(b) is liberally interpreted to permit wide-ranging discovery of information even though the information may not be admissible at the trial.") (citations and quotations omitted). Thus, "a request for discovery should be considered relevant if there is any possibility that the information sought may be relevant to the claim or defense of any party." *City of Rialto v. U.S. Dep't of Defense*, 492 F. Supp. 2d 1193, 1202 (C.D. Cal. 2007). This broad and liberal interpretation of relevance remains unaltered when discovery is sought from third-parties. *See, e.g.*, *United States ex rel. Schwartz v. TRW, Inc.*, 211 F.R.D. 388, 392 (C.D. Cal. 2002) (applying the FRCP 26(b) relevance standard to discovery of a third-party and stating that "Rule 26(b) is liberally interpreted to permit wide-ranging discovery of information"). Additionally, where, as here, the district court's only connection to the case is supervision of discovery relating to a proceeding

1  outside the district, the court "should be especially hesitant to pass judgment on what

2  constitutes relevant evidence thereunder." *Gonzales*, 234 F.R.D. at 681 (citation

3  omitted).  Therefore, "[w]here relevance is in doubt . . . the court should be

4  permissive." *Id.*

5            **a.**    **FOX's Advertising Revenue Documents**

6          FOX's Advertising Revenue Documents are vital to BMI's ability to

7  evaluate Applicants' case and defend itself.  Applicants, including FOX, have put the

8  economic health of the local television industry squarely at issue in the Rate Court

9  Proceeding by seeking a "significant reduction" in BMI license fees based largely on

10  their allegation that the economy has negatively affected their "advertising revenues,

11  the staple of their businesses." *See* Dakin-Grimm Decl. Ex. A ¶¶ 3, 14-15.  Courts

12  routinely consider advertising revenues when setting a reasonable music performing

13  right license rate.  *See, e.g.*, *ABC/CBS*, 831 F. Supp. at 161.

14          FOX programs broadcast on the FOX Affiliate Stations (the owners of

15  which are Applicants) generate two types of advertising revenue—revenue from local

16  advertising spots which are paid directly to the FOX Affiliate Stations and revenue for

17  national advertising spots, *which are paid to FOX*.  The Licensed Networks (ABC,

18  NBC, CBS and Univision) have disclosed the revenue they generate from national

19  advertising spots on the local broadcasts, in connection with purchasing their own

20  licenses from BMI.  But since FOX has not obtained its own license, BMI does not

21  possess the full picture of advertising revenues obtained as a result of the broadcasting

22  of programs using BMI music on FOX Affiliate Stations.  Neither FOX nor Applicants

23  have challenged the relevance of advertising revenues obtained by the FOX Affiliate

24  Stations for local advertising spots shown on FOX programming (not surprisingly

25  because these local advertising spots generate significantly less revenue than do the

26  national spots).  Yet FOX asserts that the revenue *it* obtains from the national spots

27  during the same programs, shown on the local stations has "nothing to do" with the

28  Rate Court Proceeding.  *See* Dakin-Grimm Decl. Ex. F at 3-4.  FOX's assertion is

baseless.  The SDNY has recognized that FOX's revenues from national spots during FOX programming on the local broadcast stations should be included when calculating the rate for the music performing right license offered to local broadcast stations.  *See United States v. ASCAP* (*In re Applications of Fox Broad. Co.*), 870 F. Supp. 1211, 1216 (S.D.N.Y. 1995) ("*Fox Broadcasting*") (noting that if ASCAP (a competing PRO) were to start separately licensing FOX programming, it would have to "exclude revenue from Fox programs" when calculating the license fees for local stations).

FOX (which is represented by the same counsel as Applicants) also contends that its revenue information is irrelevant because BMI did not produce (in the Rate Court Proceeding) documents that would show revenue information for the Licensed Networks.  This objection is meritless.  Unlike FOX, the Licensed Networks have separately paid for licenses from BMI, based on, among other things, their reported revenues.  Those revenues are, thus, not the subject of the pending Rate Court Proceeding.  Dakin-Grimm Decl. Ex. A ¶ 1.  But FOX has never obtained a license from BMI—and its Affiliate Stations have reported only a tiny portion of the revenues that programs like *American Idol* and *Glee* (and others) generate, using BMI music. To determine the real value of a license covering the use of BMI music in FOX programming, BMI must have data showing the total revenues derived from that programming, regardless of whether it is captured by the FOX Affiliate Stations or by FOX.  *See United States v. ASCAP* (*In re Application of Capital Cities/ABC, Inc.*), 157 F.R.D. 173, 197 (S.D.N.Y. 1994) ("*Buffalo Broadcasting*"); *Fox Broadcasting*, 870 F. Supp. at 1216.

FOX's additional suggestion that applicable rate court jurisprudence establishes that third-party revenue is irrelevant is meritless.  *See* Dakin-Grimm Decl. Ex. F at 3–4 (referring to *ABC/CBS*, 831 F. Supp. at 158 and *United States v. ASCAP (In re Application of Am. Online, Inc.)*, 559 F. Supp. 2d 332, 479-80 (S.D.N.Y. 2008), *vacated on other grounds*, 627 F.3d 64 (2d Cir. 2010)).  These rate court decisions say nothing about whether a rate court may properly consider third-party revenues where,

as here, the music performances contained in the purported third-party's (FOX's) programming *is the subject of the license at issue*.  Moreover, case law is clear that courts consider all advertising revenues derived from the use of music, when calculating license fees in rate court proceedings.  *See, e.g.*, *Buffalo Broadcasting*, 157 F.R.D. at 197 ("It is appropriate to take into consideration the changes in gross revenue over time as *one* variable when adjusting a fee from a pre-set base because such an adjustment accurately accounts for a number of factors").[11]

The Advertising Revenue Documents are especially important in light of FOX's claim that it "is the leading broadcast television network among Adults 18-49,"[12] the demographic most favored by advertisers.  The unmatched popularity of FOX programming with the most highly valued demographic has resulted in FOX generating unprecedented advertising revenues.  For example, *American Idol* has three "official sponsors"—Ford, Coca-Cola, and AT&T—and *The X-Factor* already has announced that Pepsi will be its official sponsor.  Dakin-Grimm Decl. Exs. R, S. These official sponsorships result in highly lucrative deals for FOX.  *See* Dakin-Grimm Decl. Ex. T (reporting that "Pepsi is ponying up more than $60 million to sponsor 'X Factor'").  *American Idol* is not the only success story at FOX, *Glee* is a "nearly half-billion-dollar brand" that "has become the network's No. 2 priority"—and

---

[11]     Similarly, BMI calculates stations' per program licenses based on revenues earned.  BMI offers local television broadcasters two forms of blanket licenses:  (i) the traditional blanket license, which allows the user access to the entirety of BMI's vast repertoire at all times, for a set price, and (ii) the per program license, which grants the broadcaster the same unlimited right to use any BMI composition, but allows the licensee a credit for programs that either (1) contain no BMI music at all or (2) contain BMI music that has been separately licensed.  *Buffalo Broad. Co. v. American Soc'y of Composers, Authors & Publishers*, 744 F.2d 917, 922 (2d Cir. 1984).  Because the per program credit is based on "a percent of the revenue derived by the station from the *particular program*," it should include *all* revenues, not just local revenues.  *See id. See e.g.*, Dakin-Grimm Decl. Ex. P.

[12]     Dakin-Grimm Decl. Ex. Q.

it "has yet to hit its peak."  *Id.* Decl. Ex. E at 1, 8.  *Glee*'s 30-second advertising spots fetch $300,000 or more.  *Id.* at 2.  BMI cannot evaluate the health of the local television broadcast industry without a complete picture of all FOX revenue.  *See Gonzales*, 234 F.R.D. at 686 (government demonstrated a "substantial need" for data from market leader Google because the government's study would be incomplete without Google's data).

### b.     FOX's Retransmission Consent Revenue Documents

Retransmission Consent Revenue Documents in FOX's possession are critical to addressing Applicants' request for "a significant reduction in annual blanket license fees to reflect Applicants' changed economic circumstances."  Dakin-Grimm Decl. Ex. A ¶ 3.  At a conference before the SDNY on May 6, 2011, the Court held that revenues from retransmission consent fees are not only relevant to the Rate Court Proceeding, but almost as directly relevant as the advertising revenues that rate courts have long considered when setting a reasonable license fee.

Under the Cable Television Consumer Protection and Competition Act of 1992 ("1992 Act"), broadcasters were allowed, for the first time, to seek compensation from cable system operators, and later satellite carriers, for allowing retransmission of local programming.[13]  Pub. L. No. 102-385, 106 Stat. 1460 (codified as amended in scattered sections of 47 U.S.C.).  This change in the law allowed local broadcasters to charge the cable and satellite providers for the retransmission of their programming.  These charges are known as "retransmission consent fees."  In essence, the local broadcasters are demanding a share of the monthly subscription fees that the cable and satellite providers collect from viewers.  For many years (after 1992), local

---

[13]     The 1992 Act, as amended, provides that broadcasters can elect either to: (1) require a cable or satellite provider to carry its broadcast signal ("must carry"), or (2) bar carriage of its signal absent a negotiated "retransmission consent" agreement.  47 U.S.C. § 325(b)(1).

broadcasters received little revenue from cable and satellite operators.  That is no longer the case.  Applicants now collect *hundreds of millions of dollars in annual retransmission consent fees*.  Dakin-Grimm Decl. Ex. O at 9-12; Dakin-Grimm Decl. Ex. W at 8 (estimating that there will be approximately $1.2 billion retransmission fees in 2011); Dakin-Grimm Decl. Ex. X (quoting CBS executive Leslie Moonves) (referring to retransmission consent revenue as a "game changer" for broadcasters).[14] As such, evidence relating to retransmission consent fees is necessary to evaluate the current and projected economic health of the local broadcast television industry.  Dakin-Grimm Decl. Ex. A ¶ 3.

FOX's Retransmission Consent Revenue Documents are particularly relevant to addressing Applicants' claims.  On March 9, 2010, certain satellite and cable providers filed a petition for rulemaking with the Federal Communications Commission ("FCC") requesting that it amend and supplement its retransmission consent rules.  Dakin-Grimm Decl. Ex. AA.  In response to an FCC notice seeking comment on the petition, FOX's corporate affiliate and parent companies (on behalf of FOX and the FOX Affiliate Stations) strongly advocated for the continuation of the current retransmission consent regime.  Among, other things, they argued that retransmission consent fees pay for the programming (including the BMI repertoire music contained therein) supplied by FOX to the FOX Affiliate Stations.  *See* Dakin-Grimm Decl. Ex. BB ("[B]roadcast content . . . is valuable to [cable and satellite operations], which should be required to pay fair compensation if they want to redistribute this popular content"); Dakin-Grimm Decl. Ex. CC at 8 ("If free, over-the-air television is to remain the home of compelling programming be it . . . the popular

---

[14]     Dakin-Grimm Decl. Ex. Y at 1 (stating that retransmission consent revenue is "[o]ne of the most positive developments for TV stations over the past five years."); *see also* Dakin-Grimm Decl. Ex. Z (News Corp. COO Chase Carey stating that retransmission consent revenue "fixes" the broadcast model and provides them a "dual revenue stream like successful cable networks").

1   new hit *Glee* or the most watched program on television, *American Idol,* broadcasters .

2   . . must develop a second revenue stream to remain competitive.").

3           Similarly, although the retransmission consent fees are paid, in the first

4   instance, to the local stations, *FOX has demanded that its Affiliates turn over the*

5   *retransmission consent fees to FOX, or face termination of their affiliation.*  FOX has

6   argued that the ability of FOX Affiliate Stations to receive retransmission consent fees

7   is due, at least in part, to the value of FOX's programming, which inevitably includes

8   the music in these programs.  *See* Dakin-Grimm Decl. Ex. DD at 1 (FOX recently

9   threatened to drop affiliated stations that refused to agree to pay FOX a portion of their

10  retransmission consent fees); Dakin-Grimm Decl. Ex. W at 8-9.

11          These fees—which are directly related to the value of the programming

12  (including the BMI music used)—are a significant new revenue stream that must now

13  be considered in setting the fees for the licenses at issue.  *See Buffalo Broadcasting*,

14  157 F.R.D. at 197; *Fox Broadcasting*, 870 F. Supp. at 1216.  FOX itself contends that

15  the fees "are worth hundreds of millions of dollars to FOX."   Dakin-Grimm Decl. Ex.

16  W at 9.

17          In sum, any documents that FOX maintains regarding its or its Affiliate

18  Stations' receipt of retransmission consent fees are directly relevant to the pending

19  Rate Court Proceeding and Applicants' claim that their economic condition are dire.

20  BMI and its experts need evidence of FOX and its Affiliate Stations' retransmission

21  consent fees to advocate effectively for BMI in the Rate Court Proceeding.

22          FOX's objection on that the request is better directed to Applicants

23  (including its Affiliate Stations) is misplaced.  FOX has publicly spearheaded

24  negotiations with cable and satellite providers for retransmission consent fees on

25  behalf of the FOX Affiliate Stations.  It therefore is likely that FOX has significantly

26  more responsive documents than the FOX Affiliate Stations.  For example, in October

27  2010, FOX negotiated a retransmission consent agreement with Cablevision on behalf

28  of several of the FOX Affiliate Stations following a highly publicized blackout of FOX

18

1   programming during the 2010 Major League Baseball World Series.  Dakin-Grimm

2   Decl. Ex. EE.  Also, as noted above, because FOX requires its Affiliate Stations to turn

3   over retransmission consent fees paid to them, FOX is likely to have documents

4   showing how much of the fees FOX receives.

5   **c.   FOX's Overall Revenue Documents**

6                As discussed above, Applicants are seeking a "significant reduction" in

7   license fees paid to BMI for the performing right to its repertoire music to reflect their

8   purported worsening economic condition.  Dakin-Grimm Decl. Ex. A ¶ 3.  To assess

9   this claim, BMI seeks information that will both give it insight into all revenues

10  derived from FOX's music rich programs and be able to put FOX's various revenue

11  streams into context.  In this regard, Request No. 6 seeks to determine all revenues

12  derived from four music-intensive FOX programs as a percentage of total revenue

13  (Request No. 10 seeks all projected revenues for *The X-Factor*, which is due to

14  premiere in September 2011) and Request Nos. 8 and 9 request financial statements

15  and total projected revenues.

16                FOX programming, much of which relies heavily on BMI music, has

17  begun to generate additional new forms of revenue.  For example *American Idol*'s

18  official sponsors work with *American Idol* to market the brand thereby increasing

19  revenues to FOX.  Dakin-Grimm Decl. Ex. R.  The *American Idol* website recently

20  announced multi-platform cross-marketing plans for each of its three sponsors: (i) Ford

21  will, among other things, "launch a truly unique consumer promotion that will offer

22  fans an exclusive chance to win a once-in-a-lifetime AMERICAN IDOL experience";

23  (ii) "AMERICAN IDOL is the kickoff platform for the new Coca-Cola Family Night

24  program," and (iii) "AT&T is connecting wireless customers to their favorite IDOL

25  moments directly from their mobile phones, including Vote Number Reminder, Idol

26  Text Chat, Idol Trivia and – of course – unlimited text-voting during the voting

27  window after each show . . . . "  *Id*.; *see also id*. Ex. GG at 2 (*American Idol* has

28  "several things going for it:  Its interactivity, which has become an industry standard;

19

its cross-platforming, via cell phones, Web sites, recordings, and concert tours"). Similarly, *The X-Factor* announced that Pepsi's "comprehensive sponsorship . . . includes an extensive, multi-platform off-air marketing partnership; weekly in-show integrations and placements; and an immersive content experience online." *Id.* Ex. S. *Glee* is no different: "gone is the old TV model of making money only off ads and syndication. Glee is a brand that, through its inventive packaging of music and the mall-ready charisma of its stars, has redefined how big a TV business can be." *Id.* Ex. E (noting that *Glee* has the No. 1 iPad app, a line of nail polish, DVDs, and is the most successful U.S. television show in the U.K.); *id.* Ex. M (*Glee* has "two Platinum and two Gold albums" and "more than 16 million song downloads."). These marketing efforts do not stop after the seasons ends either. *American Idol* is an "extensive marketing machine, driving endorsement deals, merchandise licenses and a nationwide tour that kicks into gear to support the newly crowned Idol and often the runner-up." Dakin-Grimm Decl. Ex. FF. *Glee* also has tour that begins after the season is over. *Id.* Ex. E at 2. In order to assess the value of the music used on FOX's programming, BMI must be able to survey and analyze *all* revenue generated by the programming.

Additionally, BMI needs to understand the impact of all revenue streams on FOX to determine the significance of the advertising and retransmission consent revenues. For these reasons, Requests Nos. 6 and 8-10 are relevant and FOX should be ordered to produce all documents responsive to them.

## 2. FOX's Revenue Documents Are Discoverable

FOX's assertion that the Revenue Documents contain protected confidential information (*see* Section III.B.2) is irrelevant where, as here, a Protective Order will adequately address FOX's confidentiality concerns. There is "no absolute privilege for trade secrets and similar confidential information." *Gonzales*, 234 F.R.D. at 685 (citations omitted). Thus, the "district court's role in this inquiry is to balance the need for the trade secrets against the claim of injury resulting from disclosure." *Id.* Where a protective order has been entered in the case, "the relevant injury to be

weighed in the balance is not the injury that would be caused by public disclosure, but the *injury that would result from disclosure under an appropriate protective order*." *Coca-Cola Bottling Co. of Shreveport, Inc. v. Coca-Cola Co.*, 107 F.R.D. 288, 293 (D. Del. 1985) (emphasis added).

When considering whether a protective order will satisfy confidentiality concerns, "Ninth Circuit precedent strongly favors disclosure to meet the needs of parties in pending litigation." *Beckman Indus., Inc. v. Int'l Ins. Co.,* 966 F.2d 470, 475 (9th Cir. 1992) (emphasis added) (citations omitted).  As the District Court for the Northern District of California found, "[a] survey of the relevant case law reveals that discovery is virtually always ordered once the movant has established that the secret information is [both] relevant and necessary."  *Compaq Computer Corp. v. Packard Bell Electronics, Inc.*, 163 F.R.D. 329, 338 (N.D. Cal. 1995) (quoting *Coca-Cola Bottling Co.*, 107 F.R.D. at 293) (ordering production of nonparty's commercially sensitive documents to a competitor where the protective order limited disclosure to outside counsel).  Indeed, "nothing is sacred in civil litigation; even the legendary barriers erected by The Coca-Cola Company to keep its formulae from the world must fail if the formulae are needed to allow plaintiffs and the Court to determine the truth." *Coca-Cola Bottling Co.*, 107 F.R.D. at 290 (ordering disclosure of the complete Coca-Cola formulae, including secret ingredients, because plaintiffs' need outweighed the harm of disclosure under a stringent protective order); *Centurion Indus., Inc. v. Warren Steurer & Assocs.*, 665 F.2d 323, 326 (10th Cir. 1981) (affirming the lower court's enforcement of a third-party subpoena and requiring the disclosure of trade secret information where the need outweighed the potential injury and a carefully fashioned protective order was in place); *see also Oakes v. Halvorsen Marine Ltd.*, 179 F.R.D. 281, 284 (C.D. Cal. 1998) (compelling a party to produce financial information, although it had "an interest in nondisclosure and confidentiality of its financial records" because its interest was "adequately protected by a protective order").

21

1    Here, the SDNY has entered a restrictive protective order that limits the

2  disclosure of information produced by the parties in the Rate Court Proceeding.  *See*

3  Dakin-Grimm Decl. Ex. H ¶ 3 (the "Protective Order").  BMI has agreed to work with

4  FOX to have the protections afforded the parties under the Protective Order extend to

5  FOX.  *See* Dakin-Grimm Decl. Ex. HH at 12.  Under the Protective Order, a producing

6  party may identify and designate documents it produces, or testimony given in the Rate

7  Court Proceeding, as either "CONFIDENTIAL" or "RESTRICTED" (subject to the

8  receiving party's right to object to any such designations).  Dakin-Grimm Decl. Ex. H

9  ¶¶ 3, 20.[15]  Thus, as the court in *Coca-Cola Bottling Co.* held, this Court must weigh

10  the injury to FOX from disclosure under the Protective Order against BMI's need for

11  the information.  107 F.R.D. at 293.

12    The *Compaq* case is instructive here.  In that case, plaintiff Compaq

13  Computer Corporation ("Compaq") alleged that its competitor, defendant Packard Bell

14  Electronics, Inc. ("Packard"), had engaged in false advertising because its "new"

15  computers actually contained recycled components.  *Compaq*, 163 F.R.D. at 333.

16  Seeking to show recycling computer parts is a prevalent practice in the industry,

17  Packard served subpoenas on non-party Acer, a competitor of the parties.  *Id.* at 334.

18  The court determined that Packard had a "substantial need" for the requested

19  documents because Packard's expert "will need to take a survey of competitor

20  practices" and "such testimony must be based on something more than mere surmise"

21  and ordered production over Acer's confidentiality and trade secret objections.  *Id.* at

22

23  [15]    Documents designated "CONFIDENTIAL" may only be disclosed to attorneys

24  and their agents "who are actually assisting in the Proceeding," officers and employees
   of the Receiving Party who "have a need to have access to such information," any

25  outside consultant or expert assisting a party to the Rate Court Proceeding, the Court,

26  and stenographic employees and court reporters transcribing testimony in Rate Court
   Proceeding.  Dakin-Grimm Decl. Ex. H ¶ 8.  Documents designated "RESTRICTED"

27  cannot be disclosed to officers and employees of the Receiving Party except to Willard

28  Hoyt in his capacity as Executive Director of the TMLC.  *Id.* ¶ 14.

338.  The court rejected Acer's argument that because it controlled a small share of the market, its information was irrelevant.  *Id.* at 339 n. 25.  Instead, it found that the requested documents would be "illustrative, albeit not dispositive, of industry practice."  *Id.* at 339 n. 25.  The court reasoned that although "[t]he whole picture may be greater than the sum of its parts, . . . there can be no picture at all unless the parts are collected one-by-one."  *Id.*  The court further held that Acer's confidentiality concerns would be sufficiently addressed by classifying any commercially sensitive documents as "'special confidential' under the existing protective order in the underlying litigation."  *Id.* at 339; *see also Kapila v. MTV Networks Co.*, No. 6:10-cv-181-Orl-28, at **3, 6 (M.D. Fla. May 6, 2010) (granting a motion to compel advertising revenue from a television network over objections from the network that the information was irrelevant and confidential).

Like Compaq, BMI has a substantial need for the requested Revenue Documents because such information is essential to a determination of the value of all musical performances being licensed in the Rate Court proceeding.  Because FOX programming is the subject of the requested license, all revenues derived from those programs are relevant.  As the *Compaq* court noted, without gathering the disparate parts (revenue information) from all music users, "there can be no picture at all" and BMI's case would have to be based on "mere surmise."  *Compaq*, 163 F.R.D. at 338.  This is even more true here than in *Compaq* because unlike Acer, which was only a small player in the market, FOX programming generates a large share of broadcast television revenues.  Dakin-Grimm Decl. Ex. Q (FOX is "the leading broadcast television network among Adults 18-49.").  BMI therefore has a substantial need for the Revenue Documents.  Indeed, it will be impossible for the SDNY to evaluate Applicants' claimed reduction in revenue without the requested documents.  *See Gonzales*, 234 F.R.D. at 686.  The requested discovery is both "relevant and essential to a judicial determination" of BMI's case.  *Id*. at 685.

23

**B.**   **FBC's Position and Supporting Points & Authorities**

**1.**   **Fox Broadcasting Company Is Not a Party to BMI's Rate Proceeding**

BMI is a PRO that licenses the right to publicly perform millions of musical works in its repertory, which are owned by some 400,000 affiliated music publishers, songwriters, and composers.  Because BMI has undisputed market power as a result of jointly pricing rights owned by these otherwise competing licensors, it has long been regulated by the U.S. Department of Justice and an antitrust consent decree.  The decree enables music users that wish to obtain licenses to publicly perform BMI-affiliated music, but cannot reach agreement with BMI on terms, to seek a judicial determination of "reasonable" fees from the U.S. District Court for the Southern District of New York.

The underlying Rate Court Proceeding was commenced by WPIX, Inc., which owns the New York affiliate of The CW Television Network, and the owners of approximately 1,200 other full-power commercial broadcast television stations operating in the United States.[16]  Dakin-Grimm Decl. Ex. A at 3 (the Petition). Virtually all, if not all, of these station owners have pre-existing license relationships with BMI, have signed individual licenses in the past to cover their performance of BMI-affiliated music, and are operating pursuant to interim fee agreements with BMI while the rate proceeding is pending.

_____

[16] The applicant group is comprised of those station owners that have agreed to be represented in this proceeding by the Television Music License Committee ("TMLC"), an industry association that negotiates and supervises litigation concerning performances rights licenses from BMI and other PROs.  *See generally* www.televisionmusic.com.  Representation by the TMLC is entirely voluntary. Applicants own virtually all of the full-power commercial broadcast stations in the United States, and in any event, BMI has taken the position that station owners who do not wish to be represented by the TMLC are not entitled to a different rate.  *Broad. Music, Inc. v. Weigel Broad. Co.*, 488 F. Supp. 2d 411, 414 (S.D.N.Y. 2007) ("*Weigel*"), *aff'd*, 340 Fed. Appx. 726 (2d Cir. Aug. 11, 2009) (unpublished).

1    Presumably because BMI recognizes that the asserted bases for its motion to

2    compel production of documents from FBC cannot meet the heightened discovery

3    standards for non-parties, *see, e.g.*, *Coulter v. Murrell*, No. 10-102, 2011 WL 666894

4    (S.D. Cal. Feb. 14, 2011), BMI repeatedly attempts to conflate non-party FBC with the

5    Applicants in the proceeding.  *See, e.g.,* Section III.A.1(a) *supra* ("Applicants,

6    including [FBC], have put the economic health of the local television industry squarely

7    at issue"); Section III.A.1. *supra* (inaccurately stating that FBC "has a significant

8    financial interest in the outcome of the SDNY case" and is not "a true third party").

9    BMI is well aware that FBC is not an Applicant.

10   Unlike the Applicants, FBC does not own any broadcast television stations.

11   Declaration of Del Mayberry ("Mayberry Decl.") at ¶5.  FBC distributes television

12   programming that, with only limited exceptions, is produced by other entities.  *Id.*

13   Pursuant to affiliation agreements, FBC distributes its programming via a satellite feed

14   to 203 Network Affiliates (all of which are owned by other entities) for broadcast by

15   those stations to their viewers.  *Id.*  This satellite feed comprises a small part of its

16   Network Affiliates' broadcast day.  *Id.* at ¶6.  The "public performances" for which

17   BMI is entitled to compensation occur when the stations actually *broadcast* the

18   programming they receive from FBC and others.  FBC's delivery of the network

19   satellite feed to the Network Affiliates is not considered a "public performance" and

20   thus no license is required.[17]  *See Fox Broadcasting*, 870 F. Supp. at 1218.  While BMI

21   is required to offer FBC a so-called "through to the viewer" license that would cover

22   all of the Network Affiliates' performances of BMI-affiliated music, *see* Dakin-Grimm

23   Decl. Ex. C at Article IX A (BMI consent decree), FBC is under no obligation to

24   obtain such a license.[18]  *See Fox Broadcasting*, 870 F. Supp. at 1224.  FBC has never

_____

[17]  The Applicants also have requested license coverage for certain other types of public
performances, but not for any made by FBC.  *See* Dakin-Grimm Decl. Ex A (Petition).

[18]  As discussed in *Fox Broadcasting*, ABC, CBS, and NBC take "through to the
viewer" license from PROs.  Most other television networks do not.

taken a license from BMI or any other PRO for its Network Affiliates' broadcast of programming supplied by FBC.  BMI incorrectly asserts as "beyond dispute" that "[FBC] has a significant financial interest in the outcome" of the Applicants' Rate Court Proceeding, but never explains what that financial interest is.  *See* Section III.A.1. *supra*.  In fact, there is none.

BMI continues to profess to be confused by the shorthand reference in the Applicants' Petition to "Fox" for Fox Television Stations, Inc. ("FTS") as the owner of certain stations that are part of the proceeding.[19]  *See* Respondents' Introductory Statement, n. 2 *supra*.  If BMI was genuinely confused at any point notwithstanding its pre-existing and longstanding license relationship with FTS, that confusion was promptly dispelled in FBC's meet-and-confer discussions with BMI.  *See* Dakin-Grimm Decl. Ex. F at 4 (FBC's supplemental subpoena responses); Marks Decl. Ex. Q at 1 (FBC's initial subpoena response); Marks Decl. Ex. L (March 2, 2011 letter from Benjamin E. Marks to Rachel Penski Fissell).  Indeed, BMI purported confusion is belied by its use of a Rule 45 subpoena to FBC as a non-party rather than a request for documents pursuant to Rule 34 of the Federal Rules of Civil Procedure (the "Federal Rules"), the technique it used to obtain documents from FTS stations and other Applicants.

### 2.    The Requested Revenue Information Is Extremely Confidential

The FBC revenue information requested by BMI is kept strictly confidential and is extremely sensitive commercially.  Mayberry Decl. at ¶8.  In many cases, FBC has contractual obligations to preserve the confidentiality of the information BMI has requested.  *Id.*

---

[19] 17 of FBC's 203 Network Affiliates are owned by FTS.  Mayberry Decl. at ¶5.  The remainder are owned by a variety of other entities.  *Id.*  (FTS also owns 10 stations that are affiliated with a different network, MyNetworkTV.)

FBC takes extensive steps to preserve the confidentiality of its revenues, including: (i) FBC does not publicly disclose its unconsolidated revenues or any company-specific financial statements; (ii) beyond the program fee revenues received from a particular station, FBC does not disclose its revenues with Network Affiliates, including but not limited to those owned by FTS; and (iii) FBC does not disclose its revenues to third parties that provide programming to FBC for distribution to Network Affiliates, including the entities that produce the five programs for which BMI is seeking program-specific revenue information. *Id.* FBC has provided programming to Network Affiliates for 25 years, but it has never provided the type of non-public, proprietary financial information sought here to BMI or any other PRO. *Id.* at ¶8.E.[20]

FBC would suffer substantial competitive harm were its revenues and other sensitive financial information disclosed. Disclosure of such information would compromise FBC's ability to negotiate favorable terms with counterparties to a wide variety of FBC's contractual arrangements, including Network Affiliates, program suppliers, and other intellectual property licensors and licensees, because such counterparties could use such information to their commercial advantage. *Id.* at ¶9.

While BMI argues that the Protective Order in the proceeding is sufficient to protect FBC confidentiality interests, the existence of such an order does not excuse BMI's failure to demonstrate the requisite degree of need for the information. *See, e.g.*, *Viacom Int'l, Inc. v. YouTube Inc.*, 253 F.R.D. 256, 260 (S.D.N.Y. 2008) (providing that the protections set forth in a protective order are "nevertheless not as safe as nondisclosure"); *Visto Corp. v. Smartner Info. Sys.*, Nos. 06-80339, 06-80352, 2007 WL 218771, at *4 (N.D. Cal. Jan. 29, 2007) (denying a motion to compel non-

---

[20] To the extent that FBC has advertising rate cards that it shares with potential advertisers, those rate cards are used as the starting point of negotiations. FBC rate cards do not reflect the actual prices charged for advertisements following those negotiations or FBC revenues either in general or attributable to any particular program. Mayberry Decl. at ¶8.D.

party discovery because "Although the availability of a protective order most often precludes a *party* from relying on such interests to avoid production of relevant information, Meritech is *not* a party and it is somewhat less reasonable to require it to disclose its confidential information even under such protections") (emphasis in original); *see also DirecTV, Inc. v. Trone*, 209 F.R.D. 455, 459 (C.D. Cal. 2002) (holding that "'[i]f the party seeking discovery fails to show both the relevance of the requested information and the need for the material in developing its case, there is no reason for the discovery request to be granted, and the trade secrets are not to be revealed.'") (quoting *In re Remington Arms Co.*, 952 F.2d 1029, 1032 (8th Cir. 1991)). Given the extraordinary sensitivity of the information, FBC should not be forced to bear the risk of even inadvertent disclosure.

### 3. The Confidential and Sensitive Nature of the Financial Information Requested from FBC Outweighs Any Purported Need That BMI Contends It Has for This Information

BMI incorrectly suggests that the discovery standards for non-parties like FBC here are no different than those applied to parties to litigation.  *See* Section III.A.1 *supra*.  As courts routinely recognize, however, non-parties "deserve extra protection from the courts."  *Coulter*, 2011 WL 666894, at *3; *see also In re Cusamano v. Microsoft Corp.*, 162 F.3d 708, 717 (1st Cir. 1998) ("Although discovery is by definition invasive, parties to a law suit must accept its travails as a natural concomitant of modern civil litigation.  Non-parties have a different set of expectations. Accordingly, concern for the unwanted burden thrust upon non-parties is a factor entitled to special weight in evaluating the balance of competing needs.").  Indeed, as the Ninth Circuit has observed, "the word nonparty serves as a constant reminder of the reasons for the limitations that characterize 'third party' discovery."  *Dart Indus. Co. v. Westwood Chemical Co.*, 649 F.2d 646, 649 (9th Cir. 1980) (quotation omitted).  Even the case authority cited by BMI acknowledges the restraint

that a court should employ when imposing discovery burdens on third parties.  While the *Gonzalez* court acknowedgled that "when relevance is in doubt … the court should be permissive," the court made clear in the same breath that it  "does not construe a general policy of permissiveness to require this Court to abdicate its responsibility to review a subpoena under the Federal Rules when presented with a motion to compel" and proceeded to deny substantial portions of the requested discovery.  *See, e.g., Gonzalez*, 234 F.R.D. at 680.[21]

The Federal Rules grant judicial discretion to disallow discovery if "the burden or expense of the proposed discovery outweighs its likely benefit," Fed. R. Civ. P. 26(C)(iii), and require a party issuing a subpoena to "take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena."  Fed. R. Civ. P. 45(c)(1).  A party seeking to enforce a subpoena against a non-party must demonstrate that the information sought is sufficiently relevant to the claims and defenses in the underlying proceeding.  *Beinin v. Ctr. for the Study of Popular Culture*, No. 06-2298, 2007 WL 832962, at *5 (N.D. Cal. Mar. 16, 2007) (finding that the discovery sought would "inflict costs and burdens disproportionate to whatever minimal evidentiary value the documents might have").  Because FBC is a non-party, the Court "should be particularly sensitive to weighing the probative value of the information sought against the burden of production on the non party." *BSN Med., Inc. v. Parker Med. Assoc., LLC*, No. 10 Misc. 15., 2011 WL 197217, at *2 (S.D.N.Y. Jan. 19, 2011); *see Arista Records LLC v. Lime Group LLC*, No. 06 CV 5936, 2011 WL 781198, at *2 (S.D.N.Y. Mar. 4, 2011) (reversing Magistrate Judge's determination

---

[21] Most of the other cases cited by BMI involve motions to compel discovery from parties – rather than non-parties – where the courts were not faced with the same special considerations of undue burden on non-parties at issue here.  *See, e.g., Hickman*, 329 U.S. 495; *Hill*, 242 F.R.D. 556; *City of Rialto*, 492 F. Supp. 2d 1193; *Oakes*, 179 F.R.D. 281; *Paulsen*, 168 F.R.D. 285; *Coca-Cola Bottling Co.*, 107 F.R.D. 329.

that a subpoena should be enforced because "[w]hen balancing the relevance of a particular discovery request against the burden of production, 'special weight [should be given] to the burden on non-parties of producing documents to parties involved in the litigation'") (citations omitted).

BMI cannot meet these standards.  Noting that the *Applicants* asserted in the Petition that *their* advertising revenues have declined in recent years, BMI premises its need for FBC revenue information on the need to evaluate the Applicants' case and defend itself.  *See* Section III.A.1(a) *supra*.[22]  In an effort to make the information requested from FBC appear more relevant, BMI misleadingly contends that FBC is one of the Applicants.  *Id.*  But, as discussed above, FBC is not an Applicant.  While the rate court jurisprudence cited by BMI reflects that such courts have considered the revenues of the *applicants* in those proceedings, none of those cases address the relevance of the revenues of third parties that distribute a portion of the content performed by those applicants.  *See e.g.*, *Am. Online, Inc.*, 559 F. Supp. 2d 332 (analyzing a licensing fee based on applicants revenues), *rev'd on other grounds sub nom. RealNetworks and Yahoo! Inc.*, 627 F.3d 64; *Salem Media of Cal., Inc.*, 981 F. Supp. 199 (setting per program licensing fees based on a percentage of the applicants' revenues).[23]  Indeed, BMI elsewhere correctly notes that, "[w]hen calculating a reasonable fee, rate courts consider … *applicant revenue*."  Respondent's Introductory Statement (citing *ABC/CBS*, 831 F. Supp. at 156-59) (emphasis added).

---

[22] Even more tenuously, and without explanation, BMI asserts that FBC revenue information is somehow "critical[] to assessing Applicants' claim … that their viewership is down."  Section III.A. *supra*.

[23] BMI incorrectly cites *Buffalo Broadcasting*, 157 F.R.D. at 197, as standing for the proposition that courts consider "all advertising revenues derived from the use of music when calculating license fees in rate court proceedings."  *See* Section III.A.1(a) *supra*.  That case, which was decided nearly a decade after FBC started distributing programming to Network Affiliates, set fees for a performing rights license for the local television industry without considering FBC revenues, which were never disclosed (let alone considered by the court).  *Id.*; Mayberry Decl. at ¶8.D

30

Once FBC's lack of relationship to this proceeding is exposed, BMI's claims of relevance evaporate.[24]   BMI's contention that it "cannot evaluate the health of the local television broadcast industry without a complete picture of all [FBC] revenue," *see* Section III.A.1(a) *supra*, makes no sense:  FBC is not a local television broadcaster and never has been.  BMI's related contention that "it will be impossible for the SDNY to evaluate Applicants' claimed reduction in revenue without the requested documents" from FBC, *see* Section III.A.2 *supra*, also fails once BMI's effort to falsely portray FBC as an Applicant is exposed.  Applicants have made no claims whatsoever about FBC's revenues, and the requested documents have no bearing on whether Applicants' own revenues have declined.

BMI's citation of the *Fox Broadcasting* case is curious as that case plainly undermines its position here.  FBC commenced that litigation to establish that it did not need to take a license from BMI's competitor ASCAP for performances made by its Network Affiliates when they broadcast FBC's satellite feed to their viewers.  *Fox Broadcasting*, 870 F. Supp. at 1212.  The court noted that ABC, CBS, and NBC historically have taken "through to the viewer" licenses from ASCAP and BMI to cover their affiliates' broadcasts of network programming because ABC, CBS, and NBC have greater leverage than local stations to obtain lower fees from ASCAP and BMI.  *Id.* at 1220.  While the court recognized that FBC was entitled to take such a license if it wished, it held that FBC was under no obligation to do so.  *Id.* at 1224.

BMI's purported need for FBC revenue information is belied by the reality that BMI and its sister PROs successfully have negotiated and litigated performance rights

---

[24] To the extent Applicants' revenues are relevant, FBC notes that Applicants' revenue information would be obtained from them, rather than from FBC.  Except with respect to retransmission consent payments made to local broadcast station owners by cable operators and satellite systems (addressed below), BMI does not contend that it has been unable to obtain revenue-related discovery from those Applicants in its discovery sample.

31

licenses with the local television industry for FBC's entire history without ever obtaining such information.  That 25-year period has encompassed multiple rate court litigations (including the *Buffalo Broadcasting* proceeding inaccurately cited by BMI (*see* n. 11, *supra*), two rate arbitrations, and multiple voluntary agreements between local television station owners on the one hand and PROs on the other.  Marks Decl. ¶24 & Exs. B-E.  None of these agreements for music performances made as part of broadcast signals transmissions involved fee payments calculated as a percentage of revenues.[25]   Indeed, when a station owner not represented by the TMLC sought a separate fee determination based on a percentage of its revenues, BMI refused to accommodate.  *Weigel*, 488 F. Supp.2d 411.

Likewise, BMI's suggestion that FBC revenues are necessary for fee-setting for the "per program" licenses it is required by its antitrust consent decree to offer, *see* Section III.A.1(a) *supra*, is undermined by its own negotiating history.  Such licenses have never required FBC to disclose its revenues either to BMI or the network-affiliated station licensee.  (The same is true of ASCAP's per program licenses.)  Here again, BMI's argument is dependent on its inaccurate conflation of FBC with a television station: as the excerpt quoted by BMI makes plain, "the per program credit is based on 'a percent of the revenue derived *by the station* from the particular program.'"  Section III.A.1(a) n.10 *supra* (emphasis changed).  The per program credit

_____

[25]   Historically, PROs demanded a percentage of revenues from local broadcast television stations owners as compensation for music performance rights, but Applicants have not paid on the basis of their revenues for many years.  In a landmark rate proceeding that set fees paid by the local television industry to ASCAP for the period 1985-1997, the court observed that change in Applicants' revenue was not a useful predictor of changes in the value of music performance rights.  *United States v. Am. Soc'y of Composers, Authors and Publishers (In re Application of Buffalo Broad. Co.)*, No.13-95, 1993 WL 60687, at *32-33 (S.D.N.Y. Mar. 1, 1993) ("*Buffalo Broadcasting*").

is *not* based on the revenues received by the station's program suppliers and it never has been. *See* Marks Decl. Exs. G, H (per program licenses).[26]

BMI's lack of need for FBC's revenue information is further underscored by BMI's own responses to the Applicants' discovery requests. As BMI notes, the ABC, CBS, and NBC networks take "through to the viewer" licenses on behalf of their network affiliates. When Applicants requested production of those licenses and the documents concerning their negotiation, BMI responded that such requests were overbroad, unduly burdensome, irrelevant to any claim or defense, and not reasonably calculated to lead to the discovery of admissible evidence. *See* Marks Decl. Ex. I at 7 (BMI Responses and Objections to Applicants' First Request for Production of Documents); Ex. J at 3-4 (August 25, 2010 letter from Michael Salzman to Benjamin E. Marks). After substantial back-and-forth, including multiple meet-and-confers, BMI subsequently agreed to produce the agreements themselves, although to date still has not produced them. BMI, however, continues to refuse to produce *any* information about how those license fees and terms were determined. Marks Decl. Ex. M at 2. Indeed, BMI attempted to condition production of the agreements on Applicants' commitment in advance to forego any right to seek additional discovery concerning them. *Id.* In other words, BMI has taken the position that Applicants are not entitled to know what role (if any) revenue information played in those negotiations or how BMI considered that information (if at all) in its internal deliberations. The Court should reject BMI's hypocritical effort to hold a non-party to a considerably higher discovery burden than it has been willing to bear as a party.

---

[26] A letter that BMI sent to a per program licensee (Dakin-Grimm Decl. Ex. P) demanding that it include FBC revenue information in its license fee calculation and reports conflicts with the plain language of the agreement. BMI offers no explanation for how the station would "ascertain" those revenues, since FBC does not disclose them to Network Affiliates. Mayberry Decl. at ¶8.B.

1    In sum, while BMI quotes *Compaq* for the proposition that "discovery is

2    virtually always ordered once the movant has established that the secret information is

3    [both] relevant and necessary," *see* Section III.A.2(b) *supra*, BMI has established

4    neither and thus its motion should be denied.  *Compaq*, 163 F.R.D. at 335-6

5    ("Obviously, if the sought-after documents are not relevant nor calculated to lead to

6    the discovery of admissible evidence, than *any burden whatsoever* imposed upon Acer

7    would be by definition 'undue'."); *see also Visto Corp. v. Smartner Info. Sys.*, 2007

8    WL 218771, at *4.

9    **4.    To the Extent that BMI is Entitled to Any Discovery**

10   **Concerning Applicants' Retransmission Consent**

11   **Revenues, It Should Be Obtained from the Applicants**

12   BMI's request for documents regarding retransmission consent payments

13   (payments made to local stations by cable operators and satellite providers in order to

14   carry local station signals on their platforms) is nothing more than an attempt to end

15   run a discovery dispute between Applicants and BMI.  BMI requested retransmission

16   consent payment information from the Applicants, and Applicants objected on

17   grounds, among others, of relevance and undue burden.  Marks Decl. Ex. N at 19.

18   BMI moved to compel the production of such information from Applicants.  Marks

19   Decl. Ex. P.  Following letter briefs and oral arguments at two conferences with the

20   court, the court ultimately determined on May 6, 2011 that Applicants should respond

21   *in part* to BMI's requests for retransmission consent payment information.  Marks

22   Decl. ¶27.

23   Because the information concerning retransmission consent payments that the

24   rate court has deemed sufficiently relevant for discovery purposes, will be available

25   from Applicants, there is no need to burden FBC with the additional production of any

26

27

28

portion of this information.[27]  *See Nidec Corp. v. Victor Co. of Japan*, 249 F.R.D. 575, 577 (N. D. Cal. 2007) (granting motion to quash where the discovery sought was obtainable from the defendants); *Visto Corp.*, 2007 WL 218771, at *4 (denying defendants motion to compel production from non-party).  While BMI suggests that FBC may have different documents concerning the payments made to Applicants than Applicants themselves possess, *see* Section III.A.1(b) *supra*, BMI has made no showing that the discovery it will now be able to obtain from Applicants will provide insufficient results to satisfy its discovery needs.  Thus, its motion to compel cumulative discovery from FBC should be denied.  *See, e.g.*, *Jimenez v. City of Chicago*, 733 F. Supp. 2d 1268, 1272-73 (W.D. Wa. 2010).

## IV.

## REQUEST NO. 12:  DOCUMENTS RELATED TO AUDIENCES FOR CERTAIN PROGRAMMING

**Request No. 12:**

From June 1, 2002 to the present, all documents in Your possession, custody or control, concerning audience size, audience share, ratings, and audience demographics for the following shows:  *Glee, So You Think You Can Dance, American Idol,* and *Bones.*

**Response to Request No. 12:**

Fox objects to this request on the grounds that it is overbroad, unduly burdensome, vague, ambiguous and seeks the disclosure of documents that are irrelevant and/or not reasonably calculated to lead to the discovery of admissible

---

[27]  BMI attempts to make hay out of FBC's unwillingness to be bound by the determination in the Southern District of New York as to the discoverability of Applicants' retransmission consent payment documents.  Section III.A.1(b) *supra*. Here again BMI ignores the distinction between parties and non-parties.  BMI nowhere explains why FBC, as a non-party, should agree to produce documents if the court presiding over the underlying dispute rules that BMI can obtain the information it claims it needs from the Applicants, *i.e.*, from the parties themselves.

evidence.  This request is also objectionable because it seeks the production of documents that contain confidential proprietary materials and competitively sensitive information that Fox obtains from outside sources, the disclosure of which may violate Fox's contract with those services.  Fox further objects that plaintiff can seek this information from third party ratings services itself.

**Supplemental Response to Request No. 12:**

Following a meet-and-confer with BMI, FBC supplemented its initial Objections and Responses by letter, dated March 11, 2011, from Benjamin E. Marks to Linda Dakin-Grimm and Rachel Penski Fissell (Dakin-Grimm Decl. Ex. F at 4), further responding in relevant part as follows:  "Here again, Rachel's March 8 letter mischaracterizes our February 28 telephone conference.  I said that, to the extent that FBC obtains information about the audience for the programs identified in the Request, FBC obtains that information from Nielsen.  Such information is provided to FBC subject to contractual restrictions on further disclosure.  You and I discussed that it had been extremely time-consuming and painstaking for the parties to the litigation to work out a stipulation with Nielsen that would allow them to exchange the documents in their possession with each other.  There is no reason for FBC as a third party to bear the burden of producing audience information when BMI is already itself a Nielsen customer and can purchase whatever data it wishes to have about FBC network or other programs.  I explained that Nielsen has data products available that will show the audience for not only the programs identified in the Request, but every program broadcast on every station at issue in this proceeding (as long as the audience meets a bare minimum threshold for reportability).  If you would like to stipulate with the Applicants in this proceeding as to the audience information for each of the programs identified in this Request, I can represent to you, in my separate capacity as counsel for the Applicants, that Applicants will be more than willing to work with BMI on such a stipulation."

### A.    Respondent's Position and Supporting Points & Authorities

Documents concerning audience size, ratings, share and demographics (the "Audience Information") for four of FOX's programs that rely heavily on BMI music (*Glee, So You Think You Can Dance, American Idol,* and *Bones*) are both relevant and necessary to the claims and defenses in this Rate Court Proceeding. Dakin-Grimm Decl. Ex. A ¶ 14.  Moreover, the existing protective orders in this litigation address FOX's confidentiality concerns.

### 1.    Documents Concerning Audiences are Highly Relevant

Applicants have put audience size directly at issue in the Rate Court Proceeding arguing that license fees should be lowered significantly because a claimed "massive reduction in *the size of the audience* viewing Applicants' broadcast programming" has led to a decline in their advertising revenues and "has brought with it a concomitant reduction in the value of public performances of BMI music being made by Applicants."  Dakin-Grimm Decl. Ex. A ¶¶ 14, 15 (emphasis added).  As discussed in Part III.A.1(a) *supra*, included in Applicants' "broadcast programming" is the FOX programming, which is the subject of this document request.  Thus, Audience Information for FOX programming must be considered when determining whether there has, in fact, been a so-called "massive reduction in the size of the audience viewing Applicants' broadcast programming."  *Id*. Ex. A ¶ 14.

Moreover, Audience Information for music heavy shows such as *Bones, Glee, So You Think You Can Dance,* and *American Idol* is highly relevant to BMI's position that audiences *for programs that rely heavily on BMI music* in fact have materially increased.  As BMI noted in its Response to the Petition, "[o]ne of the most important trends in television programming in recent years has been the revival of the variety show format, with an emphasis on feature musical performances."  Dakin-Grimm Decl. Ex. B ¶ 13.  Shows such as *Glee, So You Think You Can Dance,* and *American Idol* have revolutionized television programming and become some of the most highly-rated shows on television by focusing on music.  Music has become such a huge component of television (and FOX its biggest proponent) that FOX played a musical score as an accompaniment during regional NFL football games this year.  Dakin-Grimm Decl. Ex. II at 3.  As FOX explained it, "the audience is growing more accustomed to having music with every form of entertainment."  *Id*.  Many news articles have reported how, over the last decade, *American Idol*—a show focused on live performances of popular songs, including many BMI songs—has dominated

television ratings.[28]  BMI therefore seeks admissible evidence regarding FOX's

analyses of the Audience Information for FOX's music-intensive shows.  *See* Fed. R.

Civ. P. 26(b)(1) ("Parties may obtain discovery regarding any nonprivileged matter

that is relevant . . . [and] reasonably calculated to lead to the discovery of admissible

evidence.").  Because Applicants have put audience size directly at issue in the Rate

Court Proceeding (Dakin-Grimm Decl. Ex. A ¶ 14) and music in FOX's programming

will be covered by the licenses sought, information regarding the audience for FOX

programming is highly relevant and should be produced.

Recognizing these indisputable facts, FOX does not focus its objections

on the relevance of the requested information.  Instead, it argues that BMI can seek this

information directly from Nielsen Media Research ("Nielsen")[29] or from Applicants.

Dakin-Grimm Decl. Ex. F at 4.  And, FOX's counsel offered, on behalf of Applicants

(not FOX), to stipulate to the Audience Information for these shows.  *Id.*[30]

---

[28]     *See, e.g.*, Dakin-Grimm Decl. Ex. J at 1 ("Last year at this time, five weeks into
its season, *American Idol* was roaring along as television's most watched show, with
an average of 31.7 million viewers (up substantially from its fourth season, when it
averaged 28.3 million viewers over the same five weeks). . . . Improbably, this season
the show has done even better, averaging 33.5 million viewers over its first five weeks.
For perspective, at this point 'Idol' could lose half its audience and still rank among
the top 10 shows on television."); Dakin-Grimm Decl. Ex. GG at 1 ("'Idol' this year is
nipping at Oscar's toes, averaging 32.8 million viewers—a 13.9 rating and 33 share
with adults Tuesday nights.").

[29]    Nielsen is "the world's leading provider of television audience measurement and
related services.  In the United States, Nielsen's National People Meter Service
provides audience estimates for all national program sources, including broadcast
networks, Spanish language networks and national syndicators."  Dakin-Grimm Decl.
Ex. JJ.

[30]     In its portion of the Joint Stipulation (but not in the previous written
communications or in the meet and confer session), FOX informed BMI for the first
time that *Applicants* "are obtaining audience information from Nielsen, not only for
these four programs, but for every broadcast of every program covered by the
Applicants' license request."  *See* Section IV.B.1.  But whatever information that

1    These arguments are unavailing for several reasons.  First, FOX possesses

2  considerable information about its audience share beyond what it obtains from Nielsen.

3  On information and belief, FOX's "Audience Research" and "Affiliate Relations"

4  departments possess documents interpreting, analyzing, and discussing Audience

5  Information from many sources.  FOX also commissioned an industry-level study from

6  Innerscope Research, Inc., a market research firm, to examine "the role of unconscious

7  emotional response in branded entertainment, product integrations and creative

8  optimization across platforms."  *See* Dakin-Grimm Decl. Ex. KK.  As part of this study

9  or other work done by Innerscope for FOX or FOX's own "Audience Research"

10  department, FOX possesses significant documents regarding Audience Information for

11  the four music-intensive programs.

12    Second, the fact that a party to the proceeding might have some

13  information on a topic is insufficient to defeat discovery where "there is reason to

14  believe that the files of the third party may contain different versions of documents,

15  additional material, or perhaps significant omissions."  *See Viacom Int'l, Inc. v.*

16  *YouTube, Inc.,* No. C 08-80129 SI, 2008 WL 3876142, at *3 (N.D. Cal. Aug. 18, 2008)

17  (citations and internal quotation marks omitted).  This is precisely the case here.

18  Because Nielsen clients (including FOX) can purchase reports from Nielsen with

19  uniquely-tailored data, FOX likely has exclusive information from Nielsen.[31]  In fact,

20  FOX's parent corporation entered into an eight-year agreement in which Nielsen

21  agreed to "provide audience measurement services" for multiple subsidiaries including

22  FOX.  Dakin-Grimm Decl. Ex. JJ.  BMI has received *some* Nielsen data from

23  _____

24  Applicants may have is irrelevant to whether FOX has its own unique data responsive
    to this request.

25  [31]    Again, for the first time in its portion of the Joint Stipulation, but not in any prior
26  meet and confer session, FOX claimed that it does not receive "any data from Nielsen
    on an exclusive or proprietary basis" and that "all audience data that FBC receives
27  from Nielsen is available for purchase by any Nielsen customer, including BMI."  *See*
    Section IV.B.1.; Declaration of Melva Benoit ("Benoit Decl.") ¶ 4.

28

Applicants in the Rate Court Proceeding[32] and may be able to purchase certain other audience information from Nielsen.  But the Nielsen data FOX obtains is likely subject to distinct parameters and thus contains information that is different than that produced by Applicants or that could be purchased by BMI.  BMI is entitled to understand the form and manner in which FOX receives and collects Audience Information on the four music-rich programs that are the subject of this request.  *See Viacom Int'l, Inc.*, 2008 WL 3876142, at *3.

In any event, FOX now admits that it has vastly more information responsive to these requests *beyond* the data it obtains from Nielsen.  BMI is not just seeking Neilsen-prepared data, and repeatedly has so advised FOX.  FOX has admitted that it has an entire Audience Research & Intelligence Strategy department (the "FOX Audience Department") that creates many reports responsive to this request.  BMI cannot obtain this information from any other source.  BMI is willing to work with FOX to arrive at an appropriate scope of discovery from this department, but did not have the opportunity to do so because FOX *never admitted that the department existed* until it provided its part of the Joint Stipulation.

Finally, even if the Audience Information request would, in part, require the production of information already received from Applicants, FOX should be required to produce its Nielsen data and any other information responsive to this request.  *See Diamond State Ins.*, 157 F.R.D. at 697 (ordering production of documents where "although they are duplicative in part, the discovery requests have been directed toward two separate business entities . . . and the documents actually maintained in the files of each entity may not be identical").

### 2. The Protective Orders Entered in this Litigation Adequately Address FOX's Confidentiality Concerns

---

[32]     We note that the data received from Applicants is neither comprehensive across the time periods requested nor does it contain information for each of the four programs requested.  *See* Dakin-Grimm Decl. ¶ 40.

1   FOX's assertion that it is prohibited under its contract with Nielsen from

2   providing third parties with Nielsen data is easily addressed.  Dakin-Grimm Decl. Ex.

3   F at 4.  As FOX's counsel knows (because counsel was involved in the negotiations), a

4   limited waiver of the limitation on disclosure in Nielsen agreements has already been

5   negotiated and agreed to with Nielsen.  Dakin-Grimm Decl. Ex. I  at 1 (the "Nielsen

6   Protective Order").  The Nielsen Protective Order provides that all documents

7   containing Nielsen data are to be designated "Confidential Information" pursuant to

8   the Protective Order and includes a limited waiver of Nielsen's rights under its

9   contracts with the parties so that the parties can disclose this information when they

10   otherwise would not have been able to do so.  *Id*. at 2-3.  BMI repeatedly stated that it

11   is willing to work with FOX and Nielsen to ensure that the Nielsen Protective Order

12   covers any production of Nielsen data by FOX.  FOX therefore should be ordered to

13   produce the Audience Information subject to obtaining a waiver from Nielsen for the

14   production of any Nielsen information.

15   **3.**   **FOX Has Not Established Undue Burden, and Even If**

16   **It Could, BMI's Substantial Need for the Documents**

17   **Outweigh Any Burden**

18   The party asserting that a discovery request is unduly burdensome bears

19   the "heavy burden" of proof.  *In re Yassai*, 225 B.R. 478, 483–84 (Bankr. C.D. Cal.

20   1998) (citations omitted) (concluding that the subpoena was not unduly burdensome

21   where third party presented no evidence to satisfy its burden of proof).  To meet this

22   burden, the objecting party "must state specifically how, despite the broad and liberal

23   construction of federal discovery rules, each question is overly broad, unduly

24   burdensome, or oppressive by submitting affidavits or offering evidence revealing the

25   nature of the burden."  *Id*. at 484; *Thomas v. Hickman*, No. 1:06-cv-00215-AWI-SMS,

26   2007 WL 4302974, at *6 (E.D. Cal. Dec. 6, 2007) (rejecting a third-party's objections

27   to a subpoena where the objections were "not sufficiently specific or adequately

28   explained").

For the first time in its portion of this Joint Stipulation, FOX has admitted that it has the FOX Audience Department, which receives, reviews, and analyzes Nielsen data, and (ii) that producing any information from that department would be unduly burdensome. *See* Section IV.B.2.; Benoit Decl. ¶¶ 6-9. But FOX never even attempted to meet and confer with BMI to discuss what documents could be produced from this mysterious department. And FOX neither sufficiently explains its burden nor establishes that any purported burden is outweighed by BMI's overwhelming need for this information.

First, FOX does not adequately establish the burden imposed by this request. BMI's request is very limited; it seeks Audience Information for just four of FOX's many programs, one of which debuted less than two years ago and thus would have limited Audience Information. Although FOX claims that its Audience Department's creates 20-30 documents per day analyzing Nielsen data (*see* Benoit Decl. ¶ 8), it fails to assert how many of those documents relate to the four programs at issue (or whether they are in fact routine email communications between employees). And, FOX does not, as required, detail "the time, cost, or inconvenience" of responding to the Audience Information Request.[33] *In re Yassai*, 225 B.R. at 484 (party failed to meet burden where it "presented no evidence pertaining to time, cost, or inconvenience entailed in responding to the Third-Party Subpoenas."); *see also LG Display Co., Ltd. v. Chi Mei Optroelectronics Corp.*, No. 08cv2408-L (POR), 2009 WL 223585, at *2 (S.D. Cal. Jan. 28, 2009) (third-party failed to meet its burden of showing that the production of documents covering an eight year period that were archived "on microfiche or in hard copy in an off-site storage facility" was unduly burdensome). Most (if not all) of the information that the FOX Audience Department

---

[33] FOX's additional assertions about the wide dissemination of Audience Department reports are wholly irrelevant. BMI is not seeking to discover who within FOX received identical documents analyzing Nielsen data. BMI seeks only FOX's *analyses* of Audience Information for four FOX programs.

has is likely stored electronically and in this age of electronic communication, could be produced without much effort.  And "[t]he fact that complying with a discovery request will involve expense or consumption of time does not necessarily render it unduly burdensome."  *Hickman*, 2007 WL 4302974, at *10.   FOX's additional suggestion that the reports and data created by the FOX Audience Department would be duplicative of information BMI already has or can obtain from Nielsen is belied by its own admissions.  FOX claims that it creates 20-30 *unique* documents per day relating to Audience Information provided by Nielsen.  *See* Section IV.B.2.; Benoit Decl. ¶¶ 6-9.

Second, even if FOX could establish that it would be somewhat burdensome to produce the information here, courts routinely order third parties to produce responsive documents where the moving party has shown it has a substantial need.  *See, e.g.,Viacom Intern., Inc. v. YouTube*, Inc., No. C-08-80211 MISC. JF (PVT), 2009 WL 102808, at *5-6 (N.D. Cal. Jan. 14, 2009) (non-party to produce relevant documents even though search terms yielded more than one million responsive documents, totaling over five million pages); *JZ Buckingham Investments LLC v. U.S.*, 78 Fed. Cl. 15, 26 (Fed. Cl. 2007) (non-party law firm not unduly burdened where, among other things, the information sought was relevant and law firm "was not a complete stranger to the litigation and was in fact a major player in the transactions at stake").  As set forth above, BMI has a substantial need for this information.  Applicants have put audience size for the specific FOX programs that are the subject of this discovery directly at issue, and music has become an ever-growing tool that FOX uses to attract audiences.  *See* Section IV.A.1.[34]  It is simply beyond dispute that FOX's most successful television programs are heavy music users (*i.e.*,

---

[34]     For this reason, the cases upon which FOX relies are inapposite as the party seeking discovery failed to establish a sufficient need for the documents.  *See Arista Records LLC v. Lime Group LLC*, No. 06 CV 5936, 2011 WL 781198 (S.D.N.Y. Mar. 4, 2011); *Nidec Corp. v. Victor Co. of Japan*, 249 F.R.D. 575, 577 (N.D. Cal. 2007).

*American Idol*, *Glee*, *So You Think You Can Dance*.)  Further, as FOX itself concedes, *see* Section IV.B.2., rate courts consider Audience Information an important factor when setting a reasonable license fee.  *See Buffalo Broadcasting*, 157 F.R.D. at 197 ("the financial effect on the stations due to changes in their respective audience shares and viewership" was an "important factor" that must be considered); *ABC/CBS*, 831 F. Supp. 137 at 158 (considering gross revenues since "[i]t accounts for the financial effect on the network of variations in viewership or audience share").

FOX has no support for its assertion that the SDNY will consider only "objective analyses of Nielsen information" when taking audience size into consideration.  *See* Section IV.B.2.  The *Buffalo Broadcasting* case cited by FOX does not even mention Nielsen data.  *See United States v. Am. Soc'y of Composers and Publishers (In re Buffalo Broad.)*, No. 13-95(WCC), 1993 WL 60687 (S.D.N.Y. Mar. 1, 1993).  In *BMI v. Weigel*, also cited by FOX, the SDNY calculated the reasonableness of a fee for a single local television station by using a formula created by the Television Licensing Music Committee (the "TMLC"), an organization that litigates against and negotiates with PROs on behalf of Applicants.  The SDNY in *Weigel*, did not hold that the TMLC's formula was "objective," nor did it hold that only objective analyses of Nielsen data could be used to set a fee for an industry-wide license.  488 F. Supp. 411, 413, 418 (S.D.N.Y. 2007).  In conclusion, because BMI has established a substantial need for the information sought and FOX has failed to establish an undue burden, this Court should order production of the Audience Information.

## B.  FBC's Position and Supporting Points & Authorities

### 1.  BMI Can Obtain All Relevant Audience Information Through Less Burdensome and More Convenient Means

44

1    BMI seeks all of FBC's documents since January 1, 2002 concerning

2  "audience size, audience share, ratings, and audience demographics" for *Glee*, *So You*

3  *Think You Can Dance*, *American Idol*, and *Bones*.  Request No. 12.  There is a single

4  source in the television industry for these national audience metrics:  Nielsen.

5  Declaration of Melva Benoit at ¶3 ("Benoit Decl.").  Nielsen makes audience

6  information available for every broadcast of every episode of the programs identified

7  in Request No. 12.  *Id*.  Contrary to BMI's naked assertion that FBC obtains

8  information "from many sources," *see* Section IV.A.1 *supra,* FBC does not acquire

9  information on the requested metrics from any other source other than Nielsen.  Benoit

10  Decl. ¶3.

11    BMI is already a Nielsen customer.  Section IV.A.1 *supra*.  It could obtain all of

12  the information about audience size, share, ratings, and demographics for these

13  programs from Nielsen and, as BMI concedes, Nielsen, BMI, and the Applicants

14  already have a stipulated order governing the use of Nielsen audience information from

15  the parties' files as evidence in the proceeding.  Dakin-Grimm Decl. Ex. I.  BMI's

16  assertions that FBC "likely has exclusive information from Nielsen" and that the

17  Nielsen data FBC obtains is different than that which could be purchased by BMI

18  Section IV.A.1 *supra*, are contrary to fact, and BMI does not allege that it has even

19  attempted to purchase from Nielsen the audience information it wants for the identified

20  programs and time periods.[35]  *See* Benoit Decl. at ¶4; Section IV.A.1 *supra*.  Moreover,

21  _____

22  [35]  BMI's complaint that it did not learn until FBC responded to BMI's first attempt at
     this Joint Stipulation that FBC does not obtain exclusive data from Nielsen, *see* Section

23  IV.A.1 *supra,* cannot be squared with FBC's March 11, 2011 supplemental responses

24  and objections to the subpoena, which made plain that BMI "can purchase whatever
     [Nielsen] data it wishes to have about FBC network or other programs [and] explained

25  that Nielsen has data products available that will show the audience for not only the
     programs identified in the Request, but every program broadcast on every station at

26  issue in this proceeding (as long as the audience meets a bare minimum threshold for

27  reportability)."  Dakin-Grimm Decl. Ex. F at 4.

28

Applicants have explained to BMI that they are obtaining audience information from Nielsen, not only for these four programs, but for every program covered by the Applicants' license request.  Dakin-Grimm Decl. Ex. F at 4.[36]  BMI to date has declined the Applicants' offer to work with them and with Nielsen on a stipulated measurement of the change in the audience for Applicants' broadcasts during the relevant period. Section IV.A.1 *supra*.  In other words, BMI has taken none of the "reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena," required by the Federal Rules.  Fed. R. Civ. P. 45.

> ### 2.     BMI's Request for All Documents Concerning the Audience of the Identified Programs Is Unduly Burdensome

BMI's effort to obtain the same audience information from FBC that it could purchase from Nielsen amounts to no more than an effort to shift litigation costs it rightfully bears as a party to non-party FBC.  To the extent that BMI is seeking FBC internal documents containing analyses of the Applicants' audience for their broadcasts of the identified FBC programs, BMI utterly fails to demonstrate either the need for such documents or that any such need could outweigh the tremendous burden

---

[36]  In response to discovery requests propounded by BMI, the TMLC already has produced the audience information from its files (as of the agreed discovery cut-off) used to allocate industry-wide blanket license fees and to negotiate PRO licenses.  The TMLC also has produced expert reports provided by Barry Kresch, its expert on Nielsen audience measurements, in connection with past rate litigations, and Applicants have disclosed to BMI that they expect to provide expert testimony on Nielsen data from Mr. Kresch in this proceeding.  Marks Decl. ¶25.B; *see also, e.g.*, Marks Decl. Ex. R (prior Kresch report describing Nielsen Galaxy Profile software and availability of program-specific audience data).  BMI asserts a belief that information is missing for some programs and some time periods, but it does not identify what audience information it does not have, let alone what it could not get.  *See* Section IV.A.1. *supra*.

that FBC would bear in responding.  *See, e.g., Arista Records*, 2011 WL 781198, at *3 (reversing order compelling production of internal communications).

As described in the accompanying Declaration of Melva Benoit, FBC's Senior Vice President of Consumer Insight and Audience Research, more than a dozen FBC employees receive and review Nielsen audience metrics daily.  Benoit Decl. at ¶6. FBC's Audience Research department prepares 20-30 quantitative analysis each day, such as comparisons of audience ratings for FBC programming across different time periods and comparisons of the size of the audience for FBC programming in a particular time period to the audience for programming distributed by FBC's competitors.  *Id.* at ¶7.  Many of these documents have multiple versions due to FBC's internal revision process. *Id.* at ¶8.   Various analyses are then shared with *hundreds* of FBC employees in any given day.  *Id.* at ¶9.  In other words, responding to BMI's request would be extremely burdensome, and there is no reason BMI cannot instead purchase Nielsen data and perform whatever analyses it believes will be useful to it. *Id.* at ¶10.  BMI's quibble that Ms. Benoit's declaration does not put a specific price tag on the cost of compliance is meritless.  The undue burden of responding to a request that would require a non-party to search hundreds of document custodians and review hundreds of thousands of documents is self-evident.[37]

While BMI correctly notes that rate courts consider audience for music performances when setting reasonable license fees, these considerations are based on objective analyses of Nielsen information, not on whatever internal analyses non-party

---

[37] BMI's belated claim that it is now "willing to work with [FBC] to arrive at an appropriate scope of discovery" on Request No. 12 confuses the preparation of the Joint Stipulation with the meet-and-confer process it unilaterally elected to pretermit. *See generally* Local Rule 37-1 (requiring the parties to "confer in a good faith effort" to avoid a motion to compel).  In any event, there is no basis to impose *any* burden on non-party FBC in connection with the request, given the availability of the data from Nielsen through ordinary commercial channels and Applicants' willingness to work with BMI on a stipulation.

1    program suppliers like FBC might make of Nielsen metrics.  *See, e.g.*, *Weigel*, 488 F.

2    Supp. 2d at 418 (using a licensing fee allocation formula that relied on Nielsen

3    audience ratings to determine the appropriate licensing fee for a local television station

4    that was not a member of the TMLC); *see also Buffalo Broad.*, 1993 WL 60687, at

5    *39.  Prior rate court deliberations could not have been based on FBC's internal

6    audience-related documents, because those documents have not been requested in

7    another rate proceeding, let alone produced.

8           Because BMI can obtain all of the relevant audience information it needs from

9    less burdensome and more convenient sources, and whatever documents might be

10   unique to FBC are either cumulative, irrelevant, or at best of such marginal relevance

11   that they do not justify the substantial burden that FBC would bear in responding to

12   BMI's request, its motion to compel production should be denied.  *See* Fed. R. Civ. P.

13   26(b)(2)(C) (a federal court must limit the scope of discovery where it determines that

14   "the discovery sought is unreasonably cumulative or duplicative, or can be obtained

15   from some other source that is more convenient, less burdensome, or less expensive");

16   *Nidec Corp.* 249 F.R.D. at 577 (granting a motion to quash because discovery sought

17   could be obtained from a more direct, convenient, and less burdensome source).

### V.

### REQUEST NO. 14:  DOCUMENTS RELATED TO CHANGES IN MUSIC USE IN FOX PROGRAMMING

**Request No. 14:**

21          For each year from January 1, 1998 to the present, all documents
     concerning changes in: (i) the amount of music broadcast in FOX programming; (ii)
     the amount or proportion of music broadcast as feature performances, as opposed to
     background or theme music, in FOX programming.

**Response to Request No. 14:**

27          Fox objects to this request on the grounds that it is overbroad, unduly
     burdensome, vague, ambiguous and seeks the disclosure of documents that are
     irrelevant and/or not reasonably calculated to lead to the discovery of admissible

48

evidence.  This request is also objectionable because it seeks the production of documents that contain confidential proprietary materials, competitively sensitive information and/or trade secrets.

**Supplemental Response to Request No. 14:**

Following a meet-and-confer with BMI, FBC supplemented its initial Objections and Responses by letter, dated March 11, 2011, from Benjamin E. Marks to Linda Dakin-Grimm and Rachel Penski Fissell (Dakin-Grimm Decl. Ex. F at 5), further responding in relevant part as follows:  "During our February 28 telephone call, I advised you that my understanding (which is based on numerous conversations with BMI representatives over the years, including Linda) is that BMI maintains an extensive database of cue sheet information that contains for each program broadcast on television (including FBC network programs) the amount of music in the program and identifies for each music cue performed whether the cue is feature, background, or theme music.  You did not disagree.  Accordingly, FBC further objects to this Request on grounds that BMI already possesses, for the FBC programming subject to the Request, information sufficient to identify the music content by title, artist, composer, publisher, PRO affiliation and to identify the proportion of such music performances that are feature performances."

### A.     Respondent's Position and Supporting Points & Authorities

The amount and type of music broadcast in FOX programming (the "Music Use Information") is indisputably relevant to the claims and defenses in the Rate Court Proceeding and should be produced.[38]  The extent and manner in which music is performed on Applicants' programming is at the heart of this litigation.  In determining reasonable license fees, courts routinely consider music use information. *See, e.g.*, *United States v. ASCAP (In re Applications of Salem Media of Cal., Inc.)*, 981 F. Supp. 199, 210 (S.D.N.Y. 1997) (rejecting a proposed benchmark agreement due to "a contrast in their levels of music use"); *ABC/CBS*, 831 F. Supp. at 164 (calculating a reasonable fee by selecting the fee paid in a "base year" and adjusting it

---

[38]     Any concerns that FOX may have regarding the confidentiality of its music use information are adequately addressed by the Protective Order in place in the Rate Court Proceeding.  *See supra* Part III.A.2.

49

for changes in network's revenues and music use).  In reviewing this information, courts not only consider the amount of music used, but the value of that music to the licensee.  *United States v. Am. Soc'y of Composers, Authors & Publishers* (*In re Applications of RealNetworks, Inc., Yahoo! Inc.*), 627 F.3d 64, 81 (2d Cir. 2010) ("*RealNetworks*").

The requested Music Use Information is highly relevant to BMI's argument for an increase in the current fees because of recent changes in music use by Applicants.  As BMI notes in its Response, "the intensity of [Applicants'] music usage in their broadcast programming and, in particular, their reliance upon BMI-repertoire music have increased since 2004."  Dakin-Grimm Decl. Ex. B ¶ 13.  Since FOX does not separately license the music performed in its network programming, the SDNY, in setting the reasonable fee, will need to consider changes in the amount of music broadcast in, *inter alia*, FOX programming.

FOX's Music Use Information is especially relevant considering that, as discussed *supra* note 10, many of FOX's most popular programs rely heavily on music—particularly, BMI repertoire music.  Dakin-Grimm Decl. Ex. B ¶ 13.  Further, FOX programming such as *American Idol* and *Glee* are not only playing more music, but they are making music the feature of the program.[39]  It is not just the amount of music played but the manner in which that music is performed that is critical to the determination of a reasonable license fee in the Rate Court Proceeding.  *See RealNetworks*, 627 F.3d at 81.

---

[39]     Music performed on broadcast television is generally classified as either feature, theme, or background music:

> Feature music is the principal focus of audience attention, such as a song sung on a variety show.  Theme music is played at the start or conclusion of a program and serves to enhance the identification of the program.  Music in a program that is neither feature nor theme is generally considered background music.

*ABC/CBS*, 831 F. Supp. at 142.

50

FOX's position that BMI collects its own music use data misses the point. Regardless of whether BMI collects music use data, to the extent that FOX possesses any of the requested Music Use Information, the fact that FOX collects it, how the information is collected, *and what the information shows* (which may not be identical to information in the hands of others) is directly relevant to determining the value of the BMI music used on FOX's programs as it will provide an insight into how FOX measures and values music in its programming. *See Diamond State Ins.*, 157 F.R.D. at 697. Applicants have done the same thing in the Rate Court Proceeding: they seek production of BMI's music use data despite the fact that they separately track music use.

## B.   FBC's Position and Supporting Points & Authorities

### 1.   BMI Already Has All of the Music Use Information It Seeks

BMI already possesses all of the information it needs to assess, "for each year from January 1, 1998 to the present … changes in (i) the amount of music broadcast in FOX programming; [and] the amount or proportion of music broadcast as feature performances, as opposed to theme and background music, in FOX programming." Request No. 14. In BMI's own words:

> Cue sheet information is obtained by BMI in the ordinary course of business primarily for distribution purposes, as well as per program licensing purposes. These data come directly from program producers and the television stations themselves, as well as the stations' agent, Music Reports, Inc. ("MRI"). … While they are referred to as cue "sheets," much of the raw cue data is provided electronically. … What is relevant to this proceeding is Local TV *music use* data that BMI has spent years creating. BMI spends hundreds of man hours a month creating and maintaining data on music use by Local TV Stations.

51

Marks Decl. Ex. K at 3 (February 16, 2011 Letter from Linda Dakin-Grimm to R. Bruce Rich (counsel for Applicants));[40] *see also id.* at 5 ("There are approximately 24 BMI employees who are engaged daily in the validation and accuracy of supplied cue sheets along with processing steps necessary to correct any errors and incorporate within the BMI cue database."); *see generally* Marks Decl. Ex. T at 3-4 (Supplemental Response of Broadcast Music, Inc. to the First Request by WPIX, Inc. et al. for the Production of Documents) (describing BMI's collection of music cue sheet information).  BMI's cue database "at any given time" contains "millions of records." *Id.*  The database:

> indicates the minutes of music on each television show that was identified by BMI to a cue sheet for each show performed by a station during the period.  The music content of each identified broadcast program is represented in minutes, and is subdivided into "feature," "background," "theme," and "logo" music components. The music minutes are further divided into four ownership categories: (1) BMI; (2) ASCAP; (3) SESAC; and (4) Other.

*Id.* at 4.  This "aggregated music use data" is available to BMI "in an electronic format that can be easily sorted and manipulated for analysis."  *Id.*  Indeed, BMI proudly proclaims that "[n]o other licensing organization can boast of such an extensive and accessible body of information."  Marks Decl. Ex. S (*Technology Leaders*, BMI website, available at http://www.bmi.com/about/entry/533108 (last visited on 4/20/11)).  FBC possesses nothing of the kind.

Moreover, even if BMI's own records were not sufficient, the Television Music License Committee, which represents the local television industry in negotiations with

---

[40] Cue sheets list all of the music elements contained within an audio/visual program, including the name of the program, the title of all musical works performed during the program, the names of all who own copyrights in these musical works, the duration of the performance, and the PRO affiliations of copyright owners.  *See, e.g.*, *Cue & A: Everything You Need To Know About Cue Sheets,* ASCAP website, available at http://www.ascap.com/playback/2005/winter/features/cuesheets.aspx (last visited on 4/20/11).

BMI and coordinates rate court litigation on their behalf, already has produced the voluminous cue sheet data obtained and music use analyses prepared in the ordinary course of business of allocating industry-wide blanket license fees to individual stations or negotiating with PROs, as well as in connection with prior rate litigation in response to BMI's discovery requests.[41]  *See* Marks Decl. at ¶25.C.

BMI does not identify a single program distributed by FBC to its Network Affiliates for which BMI has not received the music cue sheet from the program's producer, the local stations that broadcast the program, or any of its other sources.

### 2.  FBC, as a Non-Party, Should Not Bear the Burden of Producing Information BMI Already Has

BMI utterly fails to explain why FBC should bear the burden of searching for and producing information about changes in the amount of music used and proportion of feature to other performances in FBC programs that BMI already has.  It should not. Fed. R. Civ. P. 26(b)(2)(C); Fed. R. Civ. P. 45(c)(1); *see E.E.O.C. v. Pinal County*, 714 F.Supp.2d 1073, 1078 (S.D. Cal. 2010) (denying Respondents' requests for further discovery on the grounds that Respondents failed to show that third party possessed "relevant, non-privileged information that is not cumulative or duplicative" to the information Respondents already had, "which, in the Court's view, is likely the best source of the information presently sought by Respondents"); *Moda v. Priceline.com, Inc.*, No. 06-0474, 2008 WL 4447682, at *3 (C.D.Cal., Sep. 29, 2008) (denying discovery because party "already has access to a plethora of information pertaining to" its subject matter);  *Nidec Corp.* 249 F.R.D. at 577 (granting motion to quash).

### 3.  The Court Should Reject BMI's Attempt to Impose Discovery Burdens on a Non-Party to Which It Has Objected as a Party

---

[41]  The TMLC data is based on cue sheet information collected for a sample of station broadcasts.

BMI's attempt to saddle FBC with a cumbersome search for information that duplicates what it already has is all the more outrageous given its own objection – as a party to the litigation that is seeking to be paid hundreds of millions of dollars for the Applicants' performances of music – to producing its own extensive records of cue sheet information reflecting changes in music use and the proportion of feature performances.  In the underlying litigation, when asked by the Applicant stations to produce cue sheets or other documents sufficient to identify those musical performances for which they sought payment from Applicants, BMI objected to Applicants' request as "overbroad, unduly burdensome, and calling for information that is irrelevant to any party and calling for information that is irrelevant to any claim or defense of any party and not reasonably calculated to lead to the discovery of admissible evidence." Marks Decl. Ex. I at 7 (Response of Broadcast Music, Inc. to the First Request by WPIX, Inc. et al. for the Production of Documents).  BMI further responded that:

> BMI is under no obligation under the Consent Decree or otherwise to provide the Local TV stations with access to its database of music cue sheets. This is proprietary information, collected over many years and kept current on a daily basis by BMI at great expense. The Local TV Stations have their own sources of cue sheets and have access to program producers and vendors, including the per program license administrator used by the TMLC, Music Reports, Inc., from which they can obtain similar data.

*Id*. at 8-9.  Furthermore, after months of discovery negotiations between the parties, BMI is still refusing to grant Applicants access to its cue sheet database, attempting to restrict from production any identification of what songs are performed or who actually owns them, limit access to any information to an on-site inspection some 900 miles from BMI headquarters and from the courthouse, and prevent Applicants' preferred expert for cue sheet analysis from any review at all.  Marks Decl. Ex. K at 3 (February 16, 2011 Letter from Linda Dakin-Grimm to R. Bruce Rich).  In seeking to shield its own music use information from discovery, BMI asserts that "the entire database of cue sheets has no direct relevance to this proceeding and the burden of

collecting and preparing any relevant cue sheets for production cannot be overstated." *Id.* In light of its own litigating position (however lacking in merit), BMI's motion to compel music use information from a non-party is rank hypocrisy and should be denied.[42]

## VI.

### REQUEST NO. 17-19: DOCUMENTS RELATED TO NEW MEDIA

**Request No. 17:**

From January 1, 2003 to the present, all studies, surveys, analyses, and reports in Your possession, custody or control concerning the current or future transmission of FOX programming and content via New Media,[43] including, but not limited to, programming and content transmitted via mobile devices.

**Supplemental Response to Request No. 17:**

Following a meet-and-confer with BMI, FBC supplemented its initial Objections and Responses by letter, dated March 11, 2011, from Benjamin E. Marks to Linda Dakin-Grimm and Rachel Penski Fissell (Dakin-Grimm Decl. Ex. F at 5-6), further responding in relevant part as follows: "Rachel's March 8 letter mischaracterizes our February 28 telephone conference concerning licensing of the www.fox.com. FBC and BMI do not have a final fee agreement for the www.fox.com site. As noted above, I said on the call that FBC had requested a license for its website operations from BMI. FBC further objects to this Request on the grounds that performances of FBC programming by New Media outlets other than those made by or licensed through Applicants are beyond the scope of the license at issue in the proceeding. FBC does not authorize FOX Affiliate Stations to transmit FBC programs via New Media. In

---

[42] BMI tries to draw a false equivalence between the Applicants seeking BMI's music use data even though the TMLC conducts its own analysis of music use and BMI's efforts to compel documents from FBC. BMI, as a party to the proceeding (and one that admits it is going to offer expert testimony based on its music use data, *see* Marks Decl. Ex. K at 3-4), is subject to different discovery standards than non-party FBC.

[43] The Subpoena defines "New Media" as "the delivery of programming via the internet or through a mobile, wireless, or other comparable platform, and does not include free over-the-air digital broadcasting."

addition, we note that, even though BMI is a party to the proceeding, it has refused to produce its own documents concerning new media transmissions by anyone other than Applicants, except for final license agreements.  FBC is not a party to any final license agreements for any performances of music made in connection with transmissions of FBC programming or content via New Media.  We are hard-pressed to understand why BMI should be entitled to burden a third party with requests for additional categories of documents that BMI itself has refused to produce to the Applicants on grounds of relevance and burden."

**Request No. 18:**

For each year from January 1, 2002 to the present, all studies, surveys, analyses, reports, data, compilations, comparisons, or other documents in Your possession, custody or control concerning the following:  (i) audience size and ratings for all FOX programming in New Media; (ii) the measurement of audience size and ratings for revenues derived from any and all of Your programming via New Media; (iii) changes in audience size and ratings for and revenues derived from any or all of Your programming via New Media; (iv) the extent to which the revenues derived from New Media programming compare to revenues derived from over-the-air broadcasting.

**Supplemental Response to Request No. 18:**

Following a meet-and-confer with BMI, FBC supplemented its initial Objections and Responses by letter, dated March 11, 2011, from Benjamin E. Marks to Linda Dakin-Grimm and Rachel Penski Fissell (Dakin-Grimm Decl. Ex. F at 6), further responding in relevant part as follows:  "FBC further objects to this Request on the grounds that performances of FBC programming by New Media outlets other than those made by or licensed through Applicants are beyond the scope of the license at issue in the proceeding.  As noted above, FBC does not authorize FOX Affiliate Stations to transmit FBC programs via New Media."

**Response to Request Nos. 17 & 18:**

Fox objects to this request on the grounds that it is overbroad, unduly burdensome, vague, ambiguous, excessive in terms of temporal scope and seeks the disclosure of documents that are irrelevant and/or not reasonably calculated to lead to the discovery of admissible evidence.  This request is also objectionable because it seeks the production of documents that contain confidential proprietary materials, competitively sensitive information and/or trade secrets.

56

**Request No. 19:**

Documents sufficient to show each New Media outlet with which FOX or a FOX Affiliate Station has an Agreement.

**Response to Request No. 19:**

Fox objects to this request on the grounds that it is overbroad, unduly burdensome, vague, ambiguous, and seeks the disclosure of documents that are irrelevant and/or not reasonably calculated to lead to the discovery of admissible evidence.  This request is also objectionable because it seeks the production of documents that contain confidential proprietary materials, competitively sensitive information and/or trade secrets, and at least a portion of this request is more appropriately addressed to defendants in this litigation.

**Supplemental Response to Request No. 19:**

Following a meet-and-confer with BMI, FBC supplemented its initial Objections and Responses by letter, dated March 11, 2011, from Benjamin E. Marks to Linda Dakin-Grimm and Rachel Penski Fissell (Dakin-Grimm Decl. Ex. F at 6), further responding in relevant part as follows:  "FBC further objects to this Request on the grounds that performances of FBC programming by New Media outlets other than those made by or licensed through Applicants are beyond the scope of the license at issue in the proceeding, and accordingly, documents sufficient to show the other third-party outlets through which FBC may distribute its programming (e.g., Hulu) are irrelevant and the Request is not reasonably calculated to lead to the discovery of admissible evidence.  Subject to and without waiving its General Objections, Objections to Definitions and Instructions, and Specific Objections, FBC responds that there are no FOX Affiliate Stations that are authorized to transmit FBC programs via New Media."

**A.     Respondent's Position and Supporting Points & Authorities**

Information regarding FOX's current or future transmission of FOX programming and content via New Media (Request No. 17), audience size and revenue derived from FOX's New Media transmissions (Request No. 18), and FOX's or FOX Affiliate Stations' New Media agreements (Request No. 19, together with Request

Nos. 17 and 18, the "<u>New Media Information</u>") is highly relevant and, indeed, necessary to determining the value and scope of the license requested by Applicants.[44]

Applicants seek a broader license than ever before granted that covers "performances of music in the BMI repertory in programming that is transmitted by or through Applicants, whether broadcast on Applicants' local television stations, *streamed on station-affiliated web sites, or delivered as part of programming supplied by Applicants via mobile, wireless and other digital platforms*."  Dakin-Grimm Decl. Ex. A ¶ 1 (emphasis added).  For stations that are affiliated with a larger network like FOX, which maintains its own website, determining the New Media for which Applicants seek a license can be difficult.  For example, FOX content (*e.g.,* shows likes *American Idol* or *Glee*) can be transmitted via New Media owned or controlled by three categories of entities:  (i) FOX or its parent corporations (*e.g.,* www.fox.com or www.hulu.com[45]); (ii) FOX Affiliate Stations (or indeed any broadcasting station); or (iii) an unidentified third-party to this lawsuit (*e.g.*, YouTube).[46]  Counsel for both FOX and Applicants has advised that Applicants are seeking a license only for

---

[44]   Any concerns that FOX may have regarding the confidentiality of New Media Information are adequately addressed by the Protective Order in place in the Rate Court Proceeding.  *See supra* Part III.A.2.

[45]   "Hulu is an online video service that offers a selection of hit shows, clips, movies and more" and is owned by, among others, NBCUniversal, FOX's parent News Corporation, and The Walt Disney Company.  *See* Dakin-Grim Decl. Ex. V.  Each of these entities appears to be a parent of Applicants in the Rate Court Proceeding.  *See id* Ex. A at Exhibit A.

[46]   Further muddying the waters, the Petition does not clearly define who Applicants are, but lists entities such as "Fox," "ABC," "NBC," and "Tribune" as owners of the stations, who purport to be Applicant parties to the lawsuit themselves.  *See supra* note 2.

58

websites that fall within category (ii), *i.e.* websites that are owned or controlled by Applicants' stations like the FOX Affiliate Stations.[47]

        FOX asserts that it should not be required to produce the requested documents because it "does not authorize FOX Affiliate Stations to transmit FOX programs via New Media." Dakin-Grimm Decl. Ex. F. at 5. BMI agreed to withdraw the New Media Information requests *if* FOX confirmed that *during the license term* at issue in the Rate Court Proceeding, it would not authorize FOX Affiliate Stations to transmit FOX content via New Media without seeking (and paying for) a separate license from BMI. Dakin-Grimm Decl. Ex. G. FOX refused to so agree. In these circumstances, there plainly exists the likelihood that once the license in the Rate Court Proceeding is finalized (if FOX has its way, without considering New Media revenue), FOX will reverse course and allow Fox Affiliate Stations to transmit FOX content via New Media. The fact that FOX has not agreed to terms for the use of BMI music in its shows transmitted via www.fox.com and www.hulu.com increases the likelihood of this happening. FOX's position in this motion would essentially permit it to move the transmission of its content from www.fox.com and www.hulu.com to the FOX Affiliate Stations' websites—after obtaining a license in the Rate Court Proceeding that excludes potential revenues from FOX content transmitted via New Media. In this way, FOX could use BMI music in FOX content transmitted via New Media without paying for it at all. Any information that FOX has about the transmission of its content via New Media (regardless of who owns or controls the New Media) will therefore be highly relevant to the Rate Court Proceeding.

---

[47] FOX's counsel told BMI that "performances of [FOX] programming by New Media outlets other than those made by or licensed through Applicants are beyond the scope of the license at issue in this proceeding." *Id*. Ex. F at 5. FOX's counsel contends that FOX separately sought a license for www.fox.com. *Id*. FOX, however, never pursued or finalized the terms of a license for www.fox.com with BMI. Moreover, the owners of www.hulu.com do not have a final license with BMI.

The relevance of the New Media Information is evident from BMI's Response to the Petition.  BMI asserts that there should be a "substantial increase" in fees based, in part, on the Applicants' request for an "expanded scope" license.  Dakin-Grimm Decl. Ex. B ¶ 10.  As BMI notes, Applicants "have increased their use of BMI music since 2004 . . . through their associated Internet, wireless and digital transmissions."  *Id.* ¶ 14.  In fact, New Media transmissions have transformed the television industry, leading to significant *increases* in both viewership and revenues for Applicants.  Dakin-Grimm Decl. Ex. D at 7; Ex. LL at LOCALTV00102631 (noting that the mobile video audience grew 51.2%, surpassing 20 million users for the first time, and that "today's consumers watch more video, across time and place, than ever before").  FOX has an entire unit dedicated to managing its New Media transmissions, including the New Media transmissions of its owned-and-operated stations.  Dakin-Grimm Decl. Ex. MM.  And FOX already transmits full-episodes of its programming on both www.fox.com and www.hulu.com.  *Id.* Ex. NN; Ex. OO ("Hulu is proud to have Fox as a content partner.").  If after the resolution of this litigation, FOX were to permit the transmission of FOX programming via New Media that is owned or controlled by the FOX Affiliate Stations, that would drive increases in music use, audience size, and revenues for the FOX Affiliate Stations (whose owners appear to be Applicants in the Rate Court Proceeding).  BMI therefore seeks the New Media Information so that it can determine the value of a license that would cover the transmission of FOX content via New Media owned or controlled by FOX Affiliate Stations.

FOX has refused to produce this information on the simple ground that FOX is a purported "third party."  Dakin-Grimm Decl. Ex. F at 5.  This argument is unavailing.  BMI is seeking information on the current transmission of FOX programming via New Media (*e.g.,* on sites like www.fox.com and www.hulu.com) as a basis for determining the potential impact of the transmission of this programming via Applicants' New Media during the license period at issue.  FOX has refused to

1   confirm that it will not authorize such transmission during the license period.  BMI

2   cannot assess the value of a license that covers this future transmission without

3   knowledge of the value that New Media transmission currently has to FOX.  Any such

4   information will be highly relevant to the viewership and revenues that the FOX

5   Affiliate Stations could obtain if they are to transmit FOX programming via New

6   Media.

7           **B.**     **Fox Broadcasting Company's Position and Supporting**

8                  **Points & Authorities**

9          BMI's original version of this Joint Stipulation did not address Requests 17-19.

10  Marks Decl. Ex. U.  Indeed, BMI represented in that draft filing that these requests had

11  been withdrawn.  *Id.* at p. 3 n.5.  On the same day that BMI represented it had

12  withdrawn these requests, it sent a letter acknowledging that FBC had informed BMI

13  that it has not authorized any of the Applicants to distribute FBC programming via

14  New Media and asking FBC to agree that it would never do so during the term of

15  whatever license Applicants secure from BMI through the Rate Court Proceeding.

16  Without meeting and conferring further on the subject of these requests, BMI has now

17  included these requests and new briefing on them in its revised version of the Joint

18  Stipulation.

19         BMI attempts to trivialize FBC's objections, claiming incorrectly that that FBC

20  "has refused to produce this information on the simple ground that [FBC] is a

21  purported 'third party'."  Section VI.A *supra*.  BMI ignores FBC's well-founded

22  relevance and burden objections, but this Court should not.  As with other BMI

23  requests subject to this motion, BMI's litigating position here: (i) depends on its

24  attempt to muddle various distinct parties and the licenses for which they have applied;

25  and (ii) stands in stark contrast to the position it has taken in the Southern District of

26  New York about what is relevant to the Rate Court Proceeding.

27           **1.**     **The Documents Requested Do Not Relate to**

28                **Applicants' Performances of FBC Programming**

FBC has not authorized its Network Affiliates (or any other Applicant) to distribute FBC programming via "New Media," such as their station-affiliated web sites. Dakin-Grimm Decl. Ex. F at 6. The documents requested do not relate to performances made by the Applicants. To the extent that FBC programming transmitted via "New Media," those transmissions have been made through non-party entities that have applied for their own licenses from BMI – licenses that are not at issue in the Rate Court Proceeding.

BMI garbles the scope of "New Media" rights requested by the Applicants in suggesting that they are seeking coverage only for web sites owned by stations, *see* Section VI.A *supra*, but BMI is correct that Applicants have not sought coverage for performances of FBC programming that are not made by them or licensed through them. Dakin-Grimm Decl. Ex. A at ¶1 (noting that Applicants are seeking licenses covering performances of BMI music in programming that is "transmitted by or through Applicants, whether broadcast on Applicants' local television stations, streamed on station-affiliated web sites, or delivered as part of programming supplied by Applicants via mobile, wireless, and other digital platforms").

The best BMI can muster in attempting to demonstrate a need for the documents requested is a paranoid fantasy in which FBC decides to lie in wait while Applicants and BMI litigate their Rate Court Proceeding in order to terminate distribution of FBC programming through www.fox.com and Hulu at some future point and make the same programs available on individual station-affiliated web sites. Even if that concern were legitimate, BMI fails to explain how the "value that 'New Media' transmission currently has to [FBC]" would relate to the value of the transmissions to the Applicants, let alone to the reasonable value of the right to perform whatever BMI music is embedded in the programming so transmitted.

### 2. BMI Refused to Produce Its Own Documents Related to "New Media" Performances by Non-Parties on Grounds of Relevance and Burden

When Applicants requested from BMI its documents concerning performances by and license negotiations with "Television Providers" other than Applicants for new media distribution, BMI objected that the request was "overbroad, unduly burdensome, and as irrelevant to any claim or defense of any party and not reasonably calculated to lead to the discovery of admissible evidence."  Marks Decl. Ex. I at ¶47.  BMI's position that its own assessments of the value of performances of television programming via MobiTV, Hulu, YouTube, the new media outlets of Licensed Networks and other separately licensed entities are irrelevant to the Rate Court Proceeding cannot be squared with its current contention that non-party FBC's documents about programming on its own www.fox.com website are somehow "highly relevant and, indeed, necessary to determining the value and scope of the license requested by Applicants." Section VI.A *supra*.

BMI's refusal to produce documents as to the "New Media" performances of the Licensed Networks provide a case-in-point.  BMI has refused to produce any documents concerning its analysis of "New Media" performances by the Licensed Networks or license negotiations with those Networks, asserting that they are not discoverable because "the Licensed Networks have separately paid for licenses from BMI."  Section III.A.1(a) *supra*.  Here, FBC has requested a license for any performances of FBC programming on www.fox.com that require one, and Hulu has requested a separate BMI license for any performances it makes of FBC network programs.[48]  Marks Decl. ¶26.  BMI cannot have it all ways.  The Court should reject BMI's hypocrisy and deny BMI's motion to compel.

---

[48] If BMI wants additional information from FBC for purposes of negotiating the terms of a web site license, it should proceed through ordinary commercial channels to request and obtain that information.  For example, BMI has requested, and on several occasions over the course of negotiations Hulu in good faith has supplied comprehensive responses to BMI's requests for information about Hulu's operations, manner of distribution, and content streams.  Marks Decl. 26.  That FBC and BMI have not reached final terms on their separate license is not an excuse for BMI to try to

# VII.

## FOX BROADCASTING COMPANY'S OBJECTIONS RELATING TO UNDUE BURDEN

### A.      Respondent's Position and Supporting Points & Authorities

FOX objects to every single one of BMI's requests on the grounds that they are "overbroad, unduly burdensome, vague, [and] ambiguous" but FOX fails to offer the required evidence to the substantiate its claims of burden.  Dakin-Grimm Decl Ex. KK.  These unsupported objections are insufficient to preclude discovery.  Further, each request is narrowly tailored to avoid any undue hardship on FOX.

### 1.      FOX has Done Nothing to Satisfy Its Heavy Burden of Showing That Any Request Is Vague, Ambiguous, Overbroad, or Unduly Burdensome

As set forth above, the party asserting that a discovery request is unduly burdensome bears a "heavy burden" of proof and "must state specifically how, despite the broad and liberal construction of federal discovery rules, each question is overly broad, unduly burdensome, or oppressive by submitting affidavits or offering evidence revealing the nature of the burden."  *In re Yassai*, 225 B.R. at 483–84.  This specificity requirement applies equally to objections that a request is vague or ambiguous. *Ramirez v. County of Los Angeles*, 231 F.R.D. 407, 409 (C.D. Cal. 2005) ("[I]t is well-settled that all grounds for objection must be stated with specificity."); *In re Yassai*, 225 B.R. at 484 (party failed to meet burden where it "presented no evidence pertaining to time, cost, or inconvenience entailed in responding to the Third-Party Subpoenas.").

FOX raises only unsupported, boilerplate objections to nearly all requests. With *no* evidence of the burden responding to these requests would impose, this Court

bludgeon FBC for information through a subpoena issued in an unrelated case in which FBC is not involved.

1  has no basis upon which to limit these requests.  *See, e.g.*, *In re Yassai*, 225 B.R. at

2  483–84.

3          **2.**      **BMI's Requests Are Narrowly Tailored to Seek**

4                **Information That is Critical to the Rate Court**

5                **Proceeding**

6          BMI's requests have been narrowly tailored to capture information that is

7  highly relevant to the Rate Court Proceeding.  They are limited to information about

8  specific programs during relevant time periods.  First, there is nothing vague or

9  ambiguous regarding these requests.  BMI is seeking documents relating to revenues,

10  audience size, and music use—information that is almost certainly collected by FOX in

11  the ordinary course of business.

12          Second, none of these requests is overbroad.  Several requests seek

13  information on only five of FOX's twenty-eight current or future programs.  Dakin-

14  Grimm Decl. Ex. MM.  Moreover, the temporal scope of these requests is limited to

15  time periods that are highly relevant to this litigation.  As discussed above, Applicants

16  are seeking a reasonable rate for a music performance license that covers the periods

17  from January 1, 2005-December 31, 2014.  *See* Dakin-Grimm Decl. Ex. A ¶ 2.  The

18  last license held by Applicants was negotiated between the parties in 2002 and covered

19  all music performances broadcast between April 1, 1999 through December 31, 2004.

20  BMI's requests for Revenue Documents and Audience Information therefore are

21  limited to documents from the six months after the date of the last fee agreement

22  between BMI and Applicants (June 1, 2002) to the present.  *See supra* Request Nos. 5,

23  6, 12 & 13.  Similarly, BMI seeks Music Use Information from 1998 to the present so

24  that it will be able to compare changes in the amount and type of music used in FOX

25  programming in the year prior to the beginning of the last fee agreement (January 1,

26  1998) to the present.  *See supra* Request No. 14.

27          Limited requests that seek information that is fundamental to the

28  operation of FOX's business are not unduly burdensome.  Absent any evidence to the

1  contrary, it is unlikely that FOX does not track information regarding revenues,

2  audience size, and music use in the ordinary course of business.

3  **B.   Fox Broadcasting Company's Position and Supporting**

4  **Points & Authorities**

5  BMI accuses FBC of raising only "unsupported, boilerplate objections," Section

6  VII.A.1 *supra*, but as the discussion in the preceding sections and the accompanying

7  materials submitted by FBC herewith demonstrate, nothing could be further from the

8  truth.  *See, e.g.*, Dakin-Grimm Decl. Ex. F (supplemental responses and objections

9  following meet-and-confer in which the burden and other objections were explained in

10  detail).  Unlike the parties ordered to produce documents in the *In re Yassai, Thomas,*

11  *and LG Display* cases cited by BMI, FBC has spelled out in detail the nature of its

12  objections, including why certain documents are irrelevant, why certain searches

13  would be unduly burdensome, which discovery would be cumulative and/or

14  duplicative, and which documents may be obtained from a more convenient source

15  (with the source identified).

16  BMI is also disturbingly inaccurate in its false portrayal of the burdens already

17  imposed on FBC that FBC in a good-faith response to BMI's subpoena agreed to bear.

18  For example, BMI contends that it "withdrew more than half of its requests,"

19  Respondent's Introductory Statement, yet it has moved to compel production on 12 of

20  its 19 requests.  BMI fails to advise the Court that as to the remaining seven requests, it

21  did not "withdraw" them at all.  Rather, FBC already had agreed to search for and

22  produce documents in response to those requests.  *See* Dakin-Grimm Decl. Ex. F.  FBC

23  already has undertaken the burden of searching diligently for responsive documents in

24  connection with most of the other requests that BMI now says it has withdrawn.[49]  *See*

25  

26  [49]  Indeed, it is apparent that by "withdraw" all BMI means to convey is that it has not

27  yet chosen to move to compel production in connection with those requests.  *See*

    Section VI.A *supra* (discussing BMI "withdrawal" of Requests 17-19).

28

1    *id.* FBC moreover has borne the unnecessary burden of responding to BMI's do-over

2    on this Joint Stipulation.  As explained in Sections III.B, IV.B, V.B, and VI.B above,

3    there is simply no basis for imposing the burden on FBC of responding to the

4    remaining requests that are the subject of this motion.

5        Federal Rule 45(C)(3)(A)(iv) coupled with Federal Rule 26(b)(2)(C) protects a

6    subpoenaed party from "annoyance, embarrassment, oppression, or undue burden or

7    expense."  The reasons why BMI's motion fails vary by the category of documents

8    sought, as does the degree of burden of imposed.  But in all events, the documents

9    sought are documents that BMI does not need, could obtain from a more convenient

10   source, or already has in its possession.   Because BMI has failed to demonstrate its

11   need for production of the remaining requested documents from FBC, "*any burden*

12   *whatsoever* imposed upon [it] would be by definition 'undue'."  *Compaq*, 163 F.R.D.

13   at 335-6; *see Masterson v. Campbell*, No. CIV S-05-0192, 2009 WL 2824754, at*4

14   (E.D. Ca. Sept. 1, 2009).

15   //

16   //

17   //

18   //

19   //

20   //

21   //

22   //

23   //

24   //

25   //

26   //

27   //

28   //

DATED:  May 10, 2011

MILBANK, TWEED, HADLEY
   & McCLOY LLP


LINDA DAKIN-GRIMM
601 South Figueroa Street, 30th Floor
Los Angeles, CA 90017
Telephone: (213) 892-4000
Facsimile:  (213) 629-5063

*Attorneys for Respondent Broadcast
   Music Inc.*

DATED:  May 10, 2011

CALDWELL LESLIE & PROCTOR,
P.C.


LINDA M. BURROW
1000 Wilshire Boulevard, Suite 600
Los Angeles, CA 90017-2463
Telephone: (213) 629-9040
Facsimile: (213) 629-9022

*Of counsel*:
Benjamin E. Marks (not yet admitted)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Ave.
New York, NY 10153
*Attorneys for Non-Party Fox
Broadcasting Company*

68